**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

2022 JUL 14 P FILED

| | | |
|---|---|---|
| **UNITED STATES *ex rel.* KAREN BLOOMFIELD,** | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **Relator/Plaintiff,** | ) | |
| | ) | **Case No.** 1:22-cv-789 |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| **ENGINEERED STRUCTURES, INC.,** | ) | **DO NOT PLACE IN PACER** |
| | ) | **Pursuant to 31 U.S.C. § 3730** |
| **Defendant.** | ) | **(False Claims Act)** |
| | ) | |

**RELATOR KAREN BLOOMFIELD'S COMPLAINT**

"We will continue to hold accountable those who seek to exploit the pandemic for personal gain, to protect vulnerable populations, and to safeguard the integrity of taxpayer-funded programs."[1] – Attorney General Merrick B. Garland.

The United States of America by and through *qui tam* Relator Karen Bloomfield, and her counsel, bring this action under 31 U.S.C. § 3729 *et seq.,* as amended, to recover all damages, penalties, attorneys' fees, and other remedies established by the False Claims Act. Relator seeks to recover, on behalf of the United States, proceeds obtained and retained by Defendant from claims submitted for payment to the United States in violation of the False Claims Act, 31 U.S.C.§ 3729, et seq. ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), 123 Stat. 1617, *et seq*. and the Patient Protection and Affordable Care Act of 2010.

[1] U.S. Department of Justice, *Justice Department Announces Director for COVID-19 Fraud Enforcement* (Mar. 10, 2022), https://www.justice.gov/opa/pr/justice-department-announces-director-covid-19-fraud-enforcement.

## I. SUMMARY

1. This matter involves Defendant Engineered Structures, Inc.'s ("ESI" or "Defendant") knowing and intentional submission (or at a minimum reckless disregard) of false and fraudulent claims in violation of the False Claims Act and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) between late-March 2020 and late-July 2021 by engaging in the following conduct:

- Not certifying in good faith on the Paycheck Protection Program Borrower Application that the number of full-time equivalent employees on the Applicants payroll, as well as the dollar amounts of payroll costs, was truthful and accurate;

- Not certifying in good faith on the Paycheck Protection Program Borrower Application that the information provided in its application documents and in the supporting documents was true and accurate in all material aspects; and

- Knowingly and intentionally retaining those monies instead of returning the monies in violation of the False Claims Act as a reverse false claim.

2. Instead of using Washington Federal, the bank that ESI has a long-standing relationship with and utilizes for its banking needs, ESI utilized a different bank – Idaho First Bank to obtain its April 12, 2020, PPP loan (Loan No. 4034667109). On its application, ESI misrepresented the number of employees (490), indicated that the entire $8,607,900.00 was going for payroll purposes.[2] The timing of ESI's purchase of a private jet coincides with its receipt of PPP loan funds – six months later, on November 3, 2020, a 2012 Cessna 525C with 11 seats (Serial No. 525C0091) is registered with the Federal Aviation Administration to Engineered Structures, Inc.

---

[2] *See* https://projects.propublica.org/coronavirus/bailouts/loans/engineered-structures-inc-4034667109 (last visited Jul. 5, 2022).

(Meridian, ID).[3]  ESI was one of only fifteen (15) companies in Idaho to receive between $5 million and $10 million in PPP funds.[4]

   3. The loan was ultimately forgiven in the amount of $8,706,478.00.[5]

## II. JURISDICTION AND VENUE

   4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because FCA claims present a federal question and because the United States of America is a plaintiff under 28 U.S.C. § 1345 and 31 U.S.C. § 3732.

   5. This Court has personal jurisdiction over the Defendant because the Defendant or its officers, agents, and directors reside in and/or regularly conduct business within the Eastern District of Virginia, including the fraudulent business at issue.

   6. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because the Defendant or its officers, agents, and directors reside in and/or regularly conduct business within the Eastern District of Virginia, Alexandria Division. There are no known public disclosures of the allegations and transactions in this Complaint that bar jurisdiction under the FCA, 31 U.S.C. §3730.

   7. A copy of this Complaint is being served upon the Attorney General for the United States and the United States Attorney's Office for the Eastern District of Virginia. A written disclosure statement setting forth all material evidence and information Relator possesses is also being submitted to these offices as required by 31 U.S.C. § 3730(b)(2). *See* Fed. R. Civ. P. 4(d)(4).

---

[3] *See* https://flightaware.com/resources/registration/N271ES (last visited Jul. 5, 2022*); citing* https://registry.faa.gov/AircraftInquiry/Search/NNumberResult?nNumberTxt=271ES.
[4] *See* https://boisedev.com/news/2020/07/06/idaho-ppp-loans-sba/ (Jul. 6, 2020).
[5] *See* https://www.federalpay.org/paycheck-protection-program/engineered-structures-inc-meridian-id (last visited Jul. 5, 2022).

8. Relator is the original source of the information forming the basis of this action because she possesses direct and independent knowledge of the non-public information upon which the allegations herein are based. *See* 31 U.S.C. § 3730(e)(4)(B). Relator acquired non-public information from her nearly fourteen (14) years of employment at Engineered Structures, Inc. that is independent from, and materially adds to, any publicly disclosed information relating to Defendant's violations of the False Claims Act related laws described herein. Relator's first-hand knowledge is derived from, among other things, internal emails, reports, and correspondence, both verbal and written, with Defendant's employees and personnel.

9. Relator has complied with all conditions precedent to bringing this action.

## III. PARTIES

**10. Karen Bloomfield ("Ms. Bloomfield" or "Relator")** is a United States citizen and resident of Idaho. Ms. Bloomfield holds Bachelor of Arts degree from the University of Arizona (Tucson, AZ), where she majored in business administration and minored in English and Psychology, after transferring from the University of Southern California (Los Angeles, CA), where she focused on business courses and was a member of the varsity swim team.

11. Ms. Bloomfield has extensive experience in a variety of business, accounting, and project management roles. From October 1997 to April 2020, she held a variety of positions with ESI, including Senior Assistant Project Manager (most recent) and Accounting Manager/HR Manager/Benefits Coordinator. As a Senior Assistant Project Manager, she was tasked with meeting cost objectives with respect to bid negotiation, contracting administration, purchase order initialization, job cost tracking and analysis, submitting billing and payment applications, as well as scheduling projects ranging from $5 million to $45 million for major entities, which include but are not limited to the City of Boise, Walmart, and Home Depot. In April 2020, Ms. Bloomfield

discovered that ESI was manipulating its workforce numbers and accounting to secure funds from the SBA's PPP. She and other longtime employees received notices that they were being terminated but may be brought back, despite ESI being designated as an essential business because of its primary business purpose – construction.

***Defendant***

12. **Engineered Structures, Inc. ("ESI")** is an Idaho corporation with approximately 600 employees specializing in construction services throughout 43 states in the United States and in 33 countries, with its corporate headquarters located at 3330 E. Louise Drive, Suite 300, Meridian, Idaho 83642.[6] It has two other corporate offices listed on its website: (a) 11871 NE Glenn Widing Drive, Building F, Portland, OR 97220; and (b) 14740 Flint Lee Road, Suite C, Chantilly, VA 20151.[7]

13. During the COVID-19 pandemic, relying on Federal Guidance, Idaho considered construction to be an essential business.[8] Despite its strong financial performance, long history of employing over 500 employees, and continuing to operate throughout the pandemic, ESI exploited the SBA's PPP loan program, falsified its submissions, and did not meet any of the exceptions which would have made its application for and receipt of $8,607,900.00 in federal funds lawful under this program.

---

[6] *See* https://esiconstruction.com/who-we-are/ (last visited Jul. 5, 2022).
[7] *See* https://esiconstruction.com/contact-us/ (last visited Jul. 5, 2022).
[8] *See* https://www.ncsl.org/research/labor-and-employment/covid-19-essential-workers-in-the-states.aspx (last visited Jul. 5, 2022).

## IV. THE PAYCHECK PROTECTION PROGRAM

### A. Background on the PPP

14. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281, created the PPP, initially making $349 billion in forgivable loans available to small businesses impacted by the COVID-19 pandemic. The U.S. Small Business Administration ("SBA") administers the PPP, promulgates the rules and regulations governing the PPP, and guarantees all PPP loans made by lenders.

15. The PPP allows small businesses (less than 500 employees) to obtain forgivable loans of up to $10 million, at 1% interest, to cover payroll costs, rent, mortgage interest, utilities, and other overhead expenses for a "covered period." PPP loans are processed and approved by qualified lenders that the SBA approves. Lenders may issue PPP loans without the SBA's prior review or approval, but lenders must agree to be responsible for determining borrower eligibility under the SBA's criteria. To that end, the SBA issued interim final rules governing PPP eligibility on April 2, April 3, April 14, April 24, 2020, as well as January 14, 2021, and March 11, 2021. Subsequently, the American Rescue Plan Act of 2021, Pub. L. 117-2 (Mar. 11, 2021) expanded eligibility for first and second draw PPP loans and incorporated the American Rescue Plan Act's amendments to the PPP.

16. Because the initial $349 billion originally allocated for the PPP was quickly exhausted, Congress proposed a bill authorizing a second tranche of emergency funding. Accordingly, on April 24, 2020, the President signed into law the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, whereby Congress allocated another $310 billion for PPP loans to small businesses. The SBA continued to adopt interim rules governing eligibility through June 24, 2020.

17. On June 5, 2020, the PPP was further modified when the President signed the Paycheck Protection Program Flexibility Act of 2020 ("Flexibility Act"), Pub. L. No. 116-142, 134 Stat. 641. The Flexibility Act modifies the original PPP loan criteria that was set forth in the CARES Act. Some of the major modifications set forth in the Flexibility Act are:

    a.  Congress changed the loan repayment period from 2 years to 5 years with the interest rate remaining at 1%.

    b.  Congress expanded the original 8-week "covered period" for a business to exhaust its loan proceeds on payroll, rent, mortgage interest, or utilities, before the borrower may qualify for loan forgiveness. The new covered period is the earlier of a 24-week period or December 31, 2020, for any new borrower after June 5, 2020, to spend the loan funds on approved expenses. Borrowers who borrowed before June 5, 2020, may choose between the 8-week covered period or the extended period.

    c.  Congress relaxed the requirement that 75% of the borrower's loan funds be spent on payroll expenses and reduced the requirement to 60%. The remaining 40% of the funds may be used for rent, mortgage payments, or utilities.

    d.  Congress extended the deferral period for loan repayments to begin for any unforgiven loan amount from 6 months to the date on which the borrower's forgiveness amount is remitted to the lender.

    e.  Congress extended the safe harbor date from June 30, 2020, to December 31, 2020, for a borrower to rehire laid off full-time equivalent ("FTE") employees, so as not to have the borrower's loan forgiveness amount reduced.

f. Between February 15 and December 31, 2020, loan forgiveness will be determined without regard to the reduction of FTE employees, if the borrower in good faith can prove either: (a) an inability to rehire individuals who were employees on February 15, 2020, and an inability to hire similar qualified employees by December 31, 2020; or (b) the business has been unable to return to the same level of business activity it was at before February 1, 2020, due to COVID-19 health compliance requirements.

18. As of June 20, 2020, 5,456 lenders participated in the PPP, issuing 4,666,560 loans totaling nearly $515 billion.[9] As of May 31, 2021, 5,467 lenders participated in the PPP, issuing 11,823,594 loans totaling nearly $800 billion.[10]

**B. <u>The PPP Borrower Application Form</u>**

19. The PPP's Borrower Application Form ("BAF") is uniform - lenders must use or incorporate it into their loan applications. A copy of the BAF (issued by the SBA in April 2020) is attached as Exhibit A and the revised BAF (revised by SBA on March 18, 2021) is attached as Exhibit B.

20. The BAF requires a business to provide an average monthly payroll expense, the business's number of employees, and the names of all owners who own 20% or more equity in the business, in addition to requiring the borrower to represent the "purpose of the loan" by checking

---

[9] U.S. Small Business Administration, *Paycheck Protection Program (PPP) Report* (Jun. 30, 2020), https://www.sba.gov/sites/default/files/2020-07/PPP%20Results%20-%20Sunday%20FINAL.pdf.

[10] U.S. Small Business Administration, *Paycheck Protection Program (PPP) Report* (May 31, 2021), https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf.

boxes for more than one of the following categories: payroll, lease/mortgage interest, utilities, or other (with space provided to explain "other").

21. Additionally, the BAF requires the following certifications:

a. The *Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted* that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under [the CARES Act] (the Paycheck Protection Program Rule).

b. *All SBA loan proceeds will be used only for business-related purposes as specified in the loan application* and consistent with the Paycheck Protection Program Rule.

22. The BAF further requires, in relevant part, that an authorized representative of the applicant "certify in good faith" each of the following by initialing next to each item the following:

> c. Current economic uncertainty makes this loan request *necessary to support the ongoing operations of the Applicant*.
>
> d. *The funds will be used to retain workers and maintain payroll* or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; *I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*
>
> e. *I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law*, including under 18 U.S.C. 1001 and 3571 *by imprisonment* of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine or not more than $5,000; and, if submitted to a federal insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine or not more than $1,000,000.

23. Per the express language on the BAF, Defendant ESI as the signatory was required to certify as to the truth and accuracy of these representations, the falsity of which is punishable by significant liability, fines, and imprisonment.

**C. Small Business Administration ("SBA")**

24. The Small Business Administration ("SBA") is a federal government agency that was established to assist small businesses in the United States in a variety of ways. During the COVID-19 pandemic, it was tasked with implementing the PPP loan program. Although PPP ended on May 31, 2021, existing borrowers may be eligible for PPP loan forgiveness. There were two PPP loan draws. On its website, the SBA set forth the following parameters, including who may apply and potentially qualify:[11]

- PPP loans have an interest rate of 1%.
- Loans issued prior to June 5, 2020, have a maturity of two years. Loans issued after June 5, 2020, have a maturity of five years.
- Loan payments will be deferred for borrowers who apply for loan forgiveness until SBA remits the borrower's loan forgiveness amount to the lender. If a borrower does not apply for loan forgiveness, payments are deferred 10 months after the end of the covered period for the borrower's loan forgiveness (between 8 and 24 weeks).
- No collateral or personal guarantees are required.
- Neither the government nor lenders will charge small businesses any fees.
- Sole proprietors, independent contractors, and self-employed persons.
- Any small business concern that meets SBA's size standards (either the industry size standard or the alternative size standard).
- Any business, 501(c)(3) non-profit organization, 501(c)(19) veterans organization, or tribal business concern (sec. 31(b)(2)(C) of the Small Business Act) with the greater of:
  - 500 employees, or
  - That meets the SBA industry size standard if more than 500
- Any business with a NAICS code that begins with 72 (Accommodations and Food Services) that has more than one physical location and employs less than 500 per location.

[11] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last visited Jul. 5, 2022).

25. As an initial step, borrowers filled out a *Paycheck Protection Program Borrower Application Form (OMB Control No. 3245-0407)*, which contained "Certifications and Authorizations" and required an authorized representative to certify in good faith:

1. The Applicant was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.
2. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.
3. ***The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud. (emphasis added).***
4. ***The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan. (emphasis added).***
5. I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.
6. During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

7. ***I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000. (emphasis added).***
8. ***I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews. (emphasis added).***

26. The SBA published *Paycheck Protection Program Loans Frequently Asked Questions (FAQs)*, which provides guidance for borrowers and lenders and explains small business concerns (15 U.S.C. 632 (3)) and the related exceptions, which are set forth in Table A.[12] 15 U.S.C. 632 (3) specifically states

[12] *See* https://www.sba.gov/sites/default/files/2021-01/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf (January 2021) (stating that, "[s]mall business concerns can be eligible borrowers even if they have more than 500 employees, so long as they satisfy the existing statutory and regulatory definition of 'small business concern' …[or] if it met both tests in the SBA's 'alternative size standard' as of March 27, 2020.").

**(3) VARIATION BY INDUSTRY AND CONSIDERATION OF OTHER FACTORS**
When establishing or approving any size standard pursuant to paragraph (2), the Administrator shall ensure that the size standard varies from industry to industry to the extent necessary to reflect the differing characteristics of the various industries and consider other factors deemed to be relevant by the Administrator.

27. The SBA utilizes 13 C.F.R. §121.103 to determine "the largest size a business can be to participate in government contracting programs and compete for contracts reserved or set aside for small businesses. Size standards vary by industry and are generally based on the number of employees or the amount of annual receipts."[13] Table A, which is premised on relevant questions in the *FAQs*, identifies the exceptions and indicates why ESI does not meet the requirements to qualify as a small business concern.

**Table A**

| **Relevant SBA Item** | **ESI** |
|---|---|
| Less than 500 employees averaged over the past 12 months. | **No** |
| Maximum tangible net worth of the business is not more than $15 million. | **No**[14] |
| The average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. | **No** |
| Responsibility of the borrower to determine which entities (if any) are its affiliates and | **ESI did not accurately determine the number of its employees.** |

[13] Small Business Administration, *Size standards*, https://www.sba.gov/federal-contracting/contracting-guide/size-standards (last visited Jul. 5, 2022).

[14] ESI does not qualify as a small business concern as they do not meet the revenue requirements as its average annual receipts far exceed the $39.5 million threshold, as set forth in the SBA's "size standards in millions of dollars" for the Construction Sector. *See* https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf (May 2, 2022).

| | |
|---|---|
| determine the employee headcount of the borrower and its affiliates. | |
| A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard after applying the affiliation rules, if applicable. | **ESI falsified that it was eligible because it did not meet the requisite criteria or the exceptions.** |
| Does ESI's North American Industry Classification System (NAICS) code begin with 72? | **No. ESI's NAICS code begins with 23.[15]** |

28. As set forth below, Defendant falsified the documents upon which the SBA and lenders relied. In turn, they received federal funds and knowingly retained the payments instead of returning them to the government in violation of the False Claims Act.

## V. The Operative Statutes for the Relator's Claims

### A. The False Claims Act

29. The FCA provides for civil liability for "any person who (A) knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B)."

30. Likewise, the reverse false claims provision of the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to

[15] *See* https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf (last visited Jul. 5, 2022).

an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* at § 3729(a)(1)(G).

31. To show that an entity acted "knowingly" under the FCA, it must be proven that the entity, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b)(l).

32. The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4). Compliance with a variety of laws and regulations is material to the government's decision to pay monies under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281, which created the PPP and the PRF. *See United States of America ex rel. Victoria Hablitzel v. All in Jets, LLC and Seth Bernstein*, Case No. 0:20-cv-61410 - Complaint (S.D. Fla. Jul. 12, 2020) (illustrating a recent False Claims Act settlement where the U.S. Government determined that the misstatements in the initial application, as well as the subsequent misuse of certain PPP loan funds for personal or wrongful company use, were material to the government's payment).

33. Under the False Claims Act, the United States is entitled to recover three times the amount of each claim and, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 for violations that occurred prior to November 2, 2015 and not less than $11,181 and not more than $22,363 for violations that occurred after November 2, 2015.

34. There are three broad categories of claims relevant to this case: (1) reverse false claims pursuant to Section (A)(1)(G); (2) factually false claims; and (3) legally false claims.

35. A reverse false claim occurs when any person knowingly and improperly avoids or decreases an "obligation" to pay the government in violation of 31 U.S.C. § 3729(a)(1)(G).

36. A factually false claim is defined as an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."

Legally false claims are predicated on an express or implied false certification of compliance with a regulation, statute, or contract term. *See Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1999 (2016) established that both express and implied legally false claims may form a valid basis for an FCA case.

37. When evaluating a legally false claim, the Supreme Court, in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989 (2016) required that a plaintiff/relator substantiate that compliance with the regulations was material to the government's decision to pay and that the defendant had knowledge of the falsity of the claim. Defendant's actions are material to the Government's decision to pay.

## B. The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA")

38. FIRREA was enacted in 1989 to "reform, recapitalize, and consolidate the Federal deposit insurance system, to enhance the regulatory and enforcement powers of Federal financial institutions regulatory agencies, and for other purposes."[16] FIRREA enables the government to

[16] https://www.fdic.gov/regulations/laws/rules/8000-3100.html (last visited Jul. 5, 2022).

impose civil penalties for violations of enumerated federal criminal statutes, including those that affect federally insured financial institutions. In its settlement agreement with SlideBelts, "[t]he United States contends that it has certain civil claims against Taylor and SlideBelts for violating the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a ("FIRREA"), predicated on violations of 18 U.S.C. § 1014 [loan and credit applications generally; renewals and discounts; crop insurance], 15 U.S.C. § 645(a) [fraud in connection with Small Business Administration transactions], 18 U.S.C. § 1001 [statements or entries generally], 18 U.S.C. § 1343 [wire fraud], and 18 U.S.C. § 1344 [bank fraud]."[17]

39. FIRREA provides for civil penalties if the government can establish, by the civil standard of a preponderance of the evidence, a violation of one of fourteen enumerated criminal statutes. Both the False Claims Act and FIRREA are complimentary in a government case related to loan fraud.

## VI. ESI's SCHEME AND FRAUDULENT CONDUCT

40. Defendant's false and fraudulent statements, which at a minimum constitute reckless disregard for truth or falsity of the information, violate both the False Claims Act and FIRREA as follows:

- Knowing and intentional false certifications on the Paycheck Protection Program Borrower Application that the number of full-time equivalent employees on the Applicants payroll, as well as the dollar amounts of payroll costs, was truthful and accurate;

[17] https://www.justice.gov/usao-edca/press-release/file/1352931/download (last visited Jul. 5, 2022).

- Knowing and intentional false certifications on the Paycheck Protection Program Borrower Application that the information provided in its applications and in the supporting documents were true and accurate in all material aspects; and
- Knowingly and intentionally retaining those monies instead of returning the monies in violation of the False Claims Act as a reverse false claim.

41. There is a significant disparity between actual revenues generated and the number of employees when compared to the information that was relied upon by the lender, Idaho First Bank, as well as the SBA, which backed the loans.

**A. Falsification of the Number of Employees, Available Cash/Earnings, and Layoffs**

42. On Wednesday, March 25, 2020, Idaho Governor Brad Little issued a state-wide stay at home order, with certain exceptions given to workers in industries deemed "essential." As a construction company, ESI was deemed an essential business. The next day, March 26, 2020, the ESI Safety Director issued an email addressing the ability to work and travel and emphasizing that ESI's employees were deemed essential.

43. On Friday, March 27, 2020, between the morning and mid-afternoon, ESI notified a significant number of field and office staff (approx.80-100) that the company must "temporarily reduce its workforce" as the COVID-19 pandemic impacted ESI's business. The effective date on the notification was April 1, 2020. The Relator was included in this group after working for ESI for nearly 22 years.

44. Simultaneously on March 27, 2020, ESI sends a separate email to remaining staff that, "our jobsites never closed! Our hope is that conditions will recover within the next 120 days to the point where we can recall all of our co-workers back to active duty." Most of these workers were never rehired, as they were considered "dead weight" by ESI's executives. A few days pass and

ESI posts a notice titled "Looking to Join the ESI Team" in its offices by the elevators with instructions on how to apply online due to COVID-19. During this same timeframe, ESI posts 3 job openings on LinkedIn for immediate openings, including 2 high level positions which were just vacated by employees who were just laid off. After April 12, 2020, ESI subsequently brought back less than 10% of the people that it laid off on March 27, 2020, all the while posting and hiring new people.

45. There are numerous sources which substantiate that ESI's statements in its PPP Borrower Application were knowingly false and fraudulent.

- **Idaho Business Review** – An Idaho Business Review *"Book of Lists"* for 2019-2020 named ESI number one (ranked by number of employees) as a General Contractor.  At the time, ESI employed 500 employees and its 2018 revenue was listed as $410,750,530.

- ESI's website and other various internet archives confirmed that the company has never had less than 500 employees from at least 2018 to present day.  Through its website, ESI actively publicized the number of employees they had, as well as celebrated when they reached its 500th employee in 2018.

- On June 8, 2018, ESI posted an image to its Instagram account announcing that the company had reached 500 employees.  The caption of the image read, "***"ESI now has 500 employees!  Welcome to our team #esiconstruction."***  The image was also uploaded to the ESI website on six separate occasions from September 5, 2018 through October 18, 2018.  A copy of the image is provided below.



46. Internet archives were used to capture over 200 historical websites for ESI's website (www.esiconstruction.com). The archive captured ESI's webpage on 14 occasions from February 18, 2019, through August 3, 2020. For the entire duration of 2019, ESI publicized that it maintained between 500-550 employees. The table below details the number of employees advertised on the ESI website from February 18, 2019, through the present.

| Date | # Of Employees on Website |
|---|---|
| 2/18/2019 | 550 |
| 4/19/2019 | 500 |
| 5/4/2019 | 500 |
| 6/19/2019 | 500 |
| 7/15/2019 | 500 |
| 7/30/2019 | 500 |
| 8/19/2019 | 500 |

| Date | # Of Employees on Website |
|---|---|
| 10/6/2019 | 500 |
| 10/14/2019 | 500 |
| 8/3/2020 | 550 |
| 11/22/2021 | 600 |

47. Several examples of the number of employees advertised on ESI's websites from 2019-2021:

**(The above was a screen capture of the ESI website dated 2/18/2019.)**



**(The above was a screen capture of the ESI website dated 10/14/2019.)**

**(The above was a screen capture of the ESI website dated 8/3/2020.)**



**(The above is what is currently shown on the ESI website as of 11/22/2021.)**

48. ESI laid off approximately 100 employees just before April 1, 2020, to claim that they only employed 490 workers, just below the threshold requirement for SBA PPP Loan approval, unless an exception was met. ESI did not meet the requisite exceptions as illustrated above. On April 12, 2020, ESI received approximately $8.6 million from Idaho First Bank for PPP loan number 4034667109. ESI's filings showed the approximately $8.6 million was to be utilized for payroll expenses for 490 employees. ESI did not claim expenses for rent, mortgage payments, healthcare, insurance, etc.

49. As set forth above, the *Paycheck Protection Program Borrower Application Form (OMB Control No. 3245-0407)*, which contained "Certifications and Authorizations", was required to be truthfully attested to by ESI. ESI knowingly did not meet items 3,4,7, and 8; yet, it submitted its signed application form and received millions of dollars in funds.

**B. The Use of the PPP Loan Proceeds**

50. Between April 1 and April 9, 2020, ESI applies for and on April 12, 2022, and obtains its PPP loan in the amount of approximately $8.6 million from Idaho First Bank – a financial institution with whom, to Relator and other witnesses' knowledge, ESI had never done business

with because Washington Federal was and continues to be ESI's longtime bank because of its relationship with a C-Level Executive at ESI. ESI's PPP loan details appear below:

| **ESI PPP Loan Details** | |
|---|---|
| **Loan Number:** | <REDACTED> |
| **Date Approved:** | 4/12/2020 |
| **SBA Office Code:** | 1087 |
| **Processing Method:** | PPP |
| **Borrower Name:** | Engineered Structures, Inc. |
| **Borrower Address:** | 3330 E. Louise Dr, Suite 300 |
| **Borrower City:** | Meridian |
| **Borrower State:** | ID |
| **Borrower Zip:** | 83642-5047 |
| **Loan Status Date:** | |
| **Loan Status:** | Exemption 4 |
| **Term:** | 24 |
| **SBA Guaranty Percentage:** | 100% |
| **Initial Approval Amount:** | $8,607,900.00 |
| **Current Approval Amount:** | $8,607,900.00 |
| **Undisbursed Amount:** | $0.00 |
| **Franchise Name:** | |
| **Servicing Lender Location Id:** | 436276 |

| **ESI PPP Loan Details** | |
|---|---|
| **Servicing Lender Name:** | Idaho First Bank |
| **Servicing Lender Address:** | 475 E Deinhard Ln |
| **Servicing Lender City:** | McCall |
| **Servicing Lender State:** | ID |
| **Servicing Lender Zip:** | 83638-4800 |
| **Rural Urban Indicator:** | U |
| **Hubzone Indicator:** | Y |
| **Lmi Indicator:** | Y |
| **Business Age Description:** | Existing or more than 2 years old |
| **Project City:** | Meridian |
| **Project County Name:** | Ada |
| **Project State:** | ID |
| **Project Zip:** | 83642-5047 |
| **Cd:** | Id-01 |
| **Jobs Reported:** | 490 |
| **Naics Code:** | 236220 |
| **Naics Code:** | 236220 |
| **Utilities Proceed:** | |
| **Payroll Proceed:** | $8,607,900.00 |
| **Mortgage Interest Proceed:** | |

| **ESI PPP Loan Details** | |
|---|---|
| **Rent Proceed:** | |
| **Refinance Eidl Proceed:** | |
| **Health Care Proceed:** | |
| **Debt Interest Proceed:** | |
| **Forgiveness Amount:** | $8,706,478.14 |
| **Forgiveness Date:** | 6/11/2021 |

51. In its PPP Borrower Application Form, ESI falsely attests under Item 2 that "[t]he current economic uncertainty makes this loan necessary to support the ongoing operations of the applicant." Relator has first-hand knowledge that ESI's net earnings being in excess $6 million for the years prior to the pandemic, which were consistent with ESI's December 31, 2020, year-end net earnings.

52. Prior to COVID-19 and the receipt of the PPP funds, ESI did not own a private jet, it had an arrangement to utilize one with other entities. The timing of its purchase of a private jet a 2012 Cessna525C (11 seats) just happens to coincide with the receipt of the approximately $8.6 million PPP loan in 2020. Pictures of a Cessna525C, from both the inside and outside, appear below:



53. On November 3, 2020, ESI registered its plane with the FAA as its sole owner for non-charter purposes.

54. On June 11, 2021, ESI received a PPP loan forgiveness of $8,706,478.00, despite allegedly submitting false and fraudulent statements on its initial application and the timing of the purchase of a private jet (2012 Cessna525C (11 seats)) coincides with the receipt of the PPP funds.

55. In sum, like the other PPP loan FCA/FIRREA settlements, ESI allegedly submitted false and fraudulent certifications and documentation, as well as utilizing the monies for purposes outside the scope of those expressly stated on its PPP Borrower Application. Instead of returning the ill-gotten funds to the United States Government, ESI knowingly retained the funds, which is also a violation of the False Claims Act.

## VII. CAUSES OF ACTION

### COUNT I

**False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**

***(Violations of the FCA: Presenting False Claims for Payment Against Defendant)***

56. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

57. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

58. Through the acts described above, Defendant and its agents and employees knowingly presented and caused to be presented to the Government materially false or fraudulent claims for PPP loan for the receipt of Government funds.

59. The Government, unaware of the material falsity of the claims made or caused to be made by the Defendant, approved, paid, and participated in payments made by the Government's fiscal intermediaries for PPP loan(s) that otherwise would not have been allowed.

By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

**COUNT II**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
***(Violations of the FCA: Use of False Statements Against Defendant)***

60. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

61. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

62. Defendant, knowingly or acting with deliberate ignorance or reckless disregard for the truth, presented, either directly or indirectly, false, or fraudulent claims for payment to Government programs in connection with the false certifications and attestations made on the PPP application(s) and its unauthorized use of Government funds.

63. Defendant knowingly made, used, or caused to be made or used false records and statements to get false or fraudulent claims approved for payment by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

64. The Government, unaware of the falsity for the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

**COUNT III**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
***(Violations of the FCA: Failure to Repay Government Funds Against Defendant)***

65. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

66. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

67. Defendant knowingly made, used, or caused to be made or used false records and statements material to an obligation to pay or transmit money to the Government or knowingly made, used, or caused to be made or used false records and statements material to improperly avoid or decrease an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3279(a)(1)(G).

68. Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

69. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Relator prays, on behalf of the United States of America, that judgment be entered in favor of the United States and the State and against Defendant, as follows:

A. That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

B. That this Court enter judgment against Defendant in an amount equal to treble (three times) the damages the Government has sustained because of Defendant's actions, plus a

civil penalty of not less than $10,781.00 and not more than $23,607.00 for each violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016), 87 Fed. Reg. 2187 (Jan. 13, 2022);

C. That the Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA;

D. That the Relator and his attorneys and the Government be awarded all costs of this action, including attorneys' fees and expenses; and

E. That the Relator be awarded such other and further relief as this Court may deem just and proper.

## IX. JURY DEMAND

Relator, on behalf of the United States, demands a trial by jury on all issues so triable.

Respectfully submitted this 14th day of July 2022,

Rachel Veronica Rose

By: Rachel Veronica Rose

Rachel V. Rose – Attorney at Law, PLLC
Texas Bar No. 24074982
P.O. Box 22718
Houston, Texas 77227
Email: rvrose@rvrose.com
Telephone: (713) 907-7442
***Pro Hac Vice Application Forthcoming***

Patricia D. Ryan
Virginia Bar No. 35945 (EDVA – Admitted)
Attorney at Law
6106 Harvard Ave., PO Box 633
Glen Echo, Maryland 20812
Email: patriciaryan@pdrlaw.com
Telephone: (240) 481-6284

***Attorneys for Relator***

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d), as well as the False Claims Act, the United States Attorney General and the United States Attorney for the Eastern District of Virginia were provided with a copy of this Complaint, the Motion to Seal, the Proposed Order via Certified Mail, after a file-stamped copy was received by Rachel V. Rose, Esq.

*/s/ Rachel Veronica Rose, Esq.*