**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, *ex rel.* KAREN BLOOMFIELD,**<br><br>*Plaintiff-Relator*,<br><br>**v.**<br><br>**ENGINEERED STRUCTURES, INC.,**<br><br>*Defendant*. | Civil Action No. 1:22-cv-789<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

The United States of America (the "United States" or "Government"), by and through Plaintiff-Relator, Karen Bloomfield ("Plaintiff" or "Relator" or "Plaintiff-Relator"), brings this action against Defendant, Engineered Structures, Inc. ("ESI" or "Defendant"), for treble damages and forfeitures under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., owed to the United States Government ("Government" or "United States") as a result of Defendant's knowing and reckless submission of false and fraudulent claims in connection with the Paycheck Protection Program ("PPP").[1] The United States does not object to the filing of this First Amended Complaint.[2]

[1]Attorney General Merrick B. Garland explained the Government's policy regarding PPP and similar fraud as follows: "We will continue to hold accountable those who seek to exploit the pandemic for personal gain, to protect vulnerable populations, and to safeguard the integrity of taxpayer-funded programs." U.S. Department of Justice, Justice Department Announces Director for COVID-19 Fraud Enforcement (Mar. 10, 2022), https://www.justice.gov/opa/pr/justice-department-announces-director-covid-19-fraud-enforcement.

[2]The initial Complaint was filed on July 14, 2022 in the United States District Court for the Eastern District of Virginia, Alexandria Division and assigned Case No. 1:22-cv-789.

## INTRODUCTION

1.      The COVID-19 pandemic had devastating effects on the global economy, with many governments taking unprecedented and creative measures to combat the uncertainty and limitations of the lockdowns.  One such measure taken by the Government was the introduction of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281, which created the PPP to provide emergency financial support to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  The CARES Act authorized billions of dollars in forgivable loans to small businesses struggling to pay employees and other business expenses.

2.      From late-March 2020 through late-July 2021, ESI violated the FCA by engaging in the following conduct:

- Falsely certifying on the *Paycheck Protection Program Borrower Application* the number of full-time equivalent employees on ESI's payroll, as well as the dollar amounts of its payroll costs, and failing to provide truthful and accurate certifications with respect to full-time equivalent employees and payroll costs in good faith;

- Falsely certifying on the *Paycheck Protection Program Borrower Application* that the information provided in its application documents and in the supporting documents was true and accurate in all material aspects (and failing to act in good faith in providing such certifications); and

- Knowingly and intentionally retaining monies that it wrongly and fraudulently received through false PPP applications and certifications, instead of returning the

monies in violation of the False Claims Act and thereby violating the reverse false claim provisions of the FCA.

3. ESI was one of only fifteen (15) companies in Idaho to receive between $5 million and $10 million in PPP funds.[3] The loan was ultimately forgiven in the amount of $8,706,478.00[4]—funds which were fraudulently obtained, misappropriated, and retained in direct violation of the FCA.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the FCA claims present a federal question and because the United States of America is a plaintiff under 28 U.S.C. § 1345 and 31 U.S.C. § 3732.

5. This Court has personal jurisdiction over the Defendant because the Defendant or its officers, agents, and directors reside in and/or regularly conduct business within the Eastern District of Virginia, including the fraudulent schemes and business activities at issue.

6. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because the Defendant or its officers, agents, and directors reside in and/or regularly conduct business within the Eastern District of Virginia, Alexandria Division. There are no known public disclosures of the allegations and transactions in this Complaint that bar jurisdiction under the FCA, 31 U.S.C. § 3730.

7. A copy of this Amended Complaint has been sent to and served upon the United States Attorney's Office for the Eastern District of Virginia via the Court's CM/ECF system. A written disclosure statement setting forth all material evidence and information in Relator's

---

[3] *See* https://boisedev.com/news/2020/07/06/idaho-ppp-loans-sba/ (Jul. 6, 2020).

[4] *See* https://www.federalpay.org/paycheck-protection-program/engineered-structures-inc-meridian-id (last visited Jun. 3, 2024).

possession has been submitted to these offices as required by 31 U.S.C. § 3730(b)(2). *See* Fed. R. Civ. P. 4(d)(4).

8. Relator is the original source of the information forming the basis of this action because she possesses direct and independent knowledge of the non-public information upon which the allegations herein are based. *See* 31 U.S.C. § 3730(e)(4)(B). Relator acquired non-public information from her nearly twenty-two (22) years of employment at Engineered Structures, Inc., that is independent from, and materially adds to, any publicly disclosed information relating to Defendant's violations of the False Claims Act and related laws described herein. Relator's first-hand knowledge is derived from, among other things, internal emails, reports, and correspondence, both verbal and written, with Defendant's employees and personnel.

9. Relator has complied with all conditions precedent to bringing this action.

**PARTIES**

10. Relator is a United States citizen and resident of Idaho. Plaintiff-Relator holds a Bachelor of Arts degree from the University of Arizona (Tucson, AZ), where she majored in business administration and minored in English and Psychology, after transferring from the University of Southern California (Los Angeles, CA), where she focused on business courses and was a member of the varsity swim team.

11. Relator has extensive experience in a variety of business, accounting, and project management roles. From October 1997 to April 2020, she held a variety of positions with ESI, including Senior Assistant Project Manager (most recent) and Accounting Manager/HR Manager/Benefits Coordinator. As a Senior Assistant Project Manager, she was tasked with meeting cost objectives with respect to bid negotiations, contracting administration, purchase

order initialization, job cost tracking and analysis, submitting billing and payment applications, as well as scheduling projects ranging from $5 million to $45 million for major entities, which include but are not limited to the City of Boise, Walmart, and Home Depot.

12. In April 2020, Ms. Bloomfield discovered that ESI was manipulating its workforce numbers and accounting to secure funds from the SBA's PPP. She and other longtime employees received notices that they were being terminated but might subsequently be brought back to employment, despite ESI being designated by the Federal Government and the State of Virginia as an essential business because of its primary business purpose, construction.

13. ESI is an Idaho corporation with approximately 925 employees specializing in construction services throughout 43 states in the United States as well as 36 countries, with its corporate headquarters located at 3330 E. Louise Drive, Suite 300, Meridian, Idaho 83642.[5] It has several other corporate offices listed on its website, including the following: (a) 11871 NE Glenn Widing Drive, Building F, Portland, OR 97220; and (b) 14740 Flint Lee Road, Suite C, Chantilly, VA 20151.[6]

14. During the COVID-19 pandemic, relying on federal guidance, Idaho considered construction to be an essential business.[7] Despite its strong financial performance, its long history of consistently employing over 500 employees, and its plans and expectations to continue operating throughout the pandemic, ESI exploited the SBA's PPP loan program, falsified its

---

[5] *See* https://esiconstruction.com/who-we-are/ (last visited May 31, 2024).

[6] *See* https://esiconstruction.com/contact-us/ (last visited May 31, 2024).

[7] *See* https://www.ncsl.org/research/labor-and-employment/covid-1 9-essential-workers-in-the-states.aspx (last visited May 31, 2024). On March 19, 2020, Cybersecurity and Infrastructure Security Agency ("CISA") issued a memorandum providing strategic guidance and an initial list of "Essential Critical Infrastructure Workers" to help state and local officials as they addressed COVID-19, as well as maintain the continuity of functions critical to public health and safety, as well as economic and national security." *See* https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce.

submissions, and did not meet any of the exceptions which would have made its application for and receipt of $8,607,900.00 in federal funds lawful under the PPP program.

## FACTUAL ALLEGATIONS

### I. The Paycheck Protection Program

#### A. Background on the PPP

15. On March 27, 2020, the CARES Act created the PPP, initially making $349 billion in forgivable loans available to small businesses impacted by the COVID-19 pandemic. The U.S. Small Business Administration ("SBA") administers the PPP, promulgates the rules and regulations governing the PPP, and guarantees all PPP loans made by lenders.

16. The PPP allows small businesses (less than 500 employees) to obtain forgivable loans of up to $10 million, at 1% interest, to cover payroll costs, rent, mortgage interest, utilities, and other overhead expenses for a "covered period." PPP loans are processed and approved by qualified lenders that the SBA approves. Lenders may issue PPP loans without the SBA's prior review or approval, but lenders must agree to be responsible for determining borrower eligibility under the SBA's criteria. To that end, the SBA issued interim final rules governing PPP eligibility on April 2, April 3, April 14, and April 24, 2020, as well as January 14, 2021, and March 11, 2021. Subsequently, the American Rescue Plan Act of 2021, Pub. L. 117-2 (Mar. 11, 2021), expanded eligibility for first and second draw PPP loans and incorporated the American Rescue Plan Act's amendments to the PPP.

17. Because the initial $349 billion originally allocated for the PPP was quickly exhausted, Congress proposed a bill authorizing a second tranche of emergency funding. Accordingly, on April 24, 2020, the President signed into law the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, whereby Congress

allocated another $310 billion for PPP loans to small businesses.  The SBA continued to adopt interim rules governing eligibility through June 24, 2020.

18.     On June 5, 2020, the PPP was further modified when the President signed the Paycheck Protection Program Flexibility Act of 2020 ("Flexibility Act"), Pub. L. No.116-142, 134 Stat. 641.  The Flexibility Act modifies the original PPP loan criteria that was set forth in the CARES Act.  Some of the major modifications set forth in the Flexibility Act are:

    a.   Congress changed the loan repayment period from 2 years to 5 years with the interest rate remaining at l%.

    b.   Congress expanded the original 8-week "covered period" for a business to exhaust its loan proceeds on payroll, rent, mortgage interest, or utilities, before the borrower may qualify for loan forgiveness.  The new covered period is the earlier of a 24-week period or December 31, 2020, for any new borrower after June 5, 2020, to spend the loan funds on approved expenses.  Borrowers who borrowed before June 5, 2020, may choose between the 8-week covered period or the extended period.

    c.   Congress relaxed the requirement that 75% of the borrower's loan funds be spent on payroll expenses and reduced the requirement to 60%. The remaining 40% of the funds may be used for rent, mortgage payments, or utilities.

    d.   Congress extended the deferral period for loan repayments to begin for any unforgiven loan amount from 6 months to the date on which the borrower's forgiveness amount is remitted to the lender.

    e.   Congress extended the safe harbor date from June 30, 2020, to December 31, 2020, for a borrower to rehire laid off full-time equivalent ("FTE") employees, so as not to have the borrower's loan forgiveness amount reduced.

    f.   Between February 15 and December 31, 2020, loan forgiveness would be determined without regard to the reduction of FTE employees, if the borrower in good faith could prove either: (a) an inability to rehire individuals who were employees on February 15, 2020, and an inability to hire similar qualified employees by December 31, or (b) the business had been unable to return to the same level of business activity it was at before February 1, 2020, due to COVID-19 health compliance requirements.

19. As of June 20, 2020, 5,456 lenders participated in the PPP, issuing 4,666,560 loans totaling nearly $515 billion.[8] As of May 31, 2021, 5,467 lenders participated in the PPP, issuing 11,823,594 loans totaling nearly $800 billion.[9]

**B. The PPP Borrower Application Form**

20. The PPP's Borrower Application Form ("BAF") is uniform, and lenders must use or incorporate it into their loan applications. A copy of the BAF (issued by the SBA in April 2020) is attached as Exhibit "A" and the revised BAF (revised by SBA on March 18, 2021) is attached as Exhibit "B."

21. The BAF requires a business to provide an average monthly payroll expense, the business's number of employees, and the names of all owners who own 20% or more equity in the business, in addition to requiring the borrower to represent the "purpose of the loan" by checking boxes for more than one of the following categories: payroll, lease/mortgage interest, utilities, or other (with space provided to explain "other").

22. Additionally, the BAF requires the following certifications:

a. The ***Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted*** that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under [the CARES Act] (the Paycheck Protection Program Rule). (emphasis added).

b. ***All SBA loan proceeds will be used only for business-related purposes as specified in the loan application*** and consistent with the Paycheck Protection Program Rule. (emphasis added).

23. The BAF further requires, in relevant part, that an authorized representative of the applicant "certify in good faith" each of the following items by initialing next to each item:

---

[8] U.S. Small Business Administration, Paycheck Protection Program (PPP) Report (Jun. 30, 2020), https://www.sba.gov/sites/default/files/2020-07/PPP%20Results%20-%20Sunday%20FINAL-508.pdf.

[9] U.S. Small Business Administration, Paycheck Protection Program (PPP) Report (May 31, 2021), https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf.

    c.   Current economic uncertainty makes this loan request ***necessary to support the ongoing operations of the Applicant.*** (emphasis added).

    d.   ***The funds will be used to retain workers and maintain payroll*** or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; ***I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud***. (emphasis added).

    e.   ***I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law***, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine or not more than $5,000; and, if submitted to a federal insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine or not more than $1,000,000. (emphasis added).

24.    Pursuant to the express language in the BAF, ESI, as the signatory, was required to certify as to the truth and accuracy of these representations, the falsity of which is punishable by significant liability, fines, and imprisonment.

**C.    Small Business Administration ("SBA")**

25.    The Small Business Administration ("SBA") is a federal government agency that was established to assist small businesses in the United States in a variety of ways. During the COVID-19 pandemic, it was tasked with implementing the PPP loan program. Although PPP ended on May 31, 2021, existing borrowers may be eligible for PPP loan forgiveness. There were two PPP loan draws (the "First Draw PPP loan" and the "Second Draw PPP loan") with the same general loan terms.

26. On its website, the SBA states that it will forgive First Draw PPP loans if all employee retention criteria are met and the funds are used for eligible expenses. The following parameters apply:[10]

- PPP loans have an interest rate of 1%.
- Loans issued prior to June 5, 2020, have a maturity of two years. Loans issued after June 5, 2020, have a maturity of five years.
- Loan payments will be deferred for borrowers who apply for loan forgiveness until SBA remits the borrower's loan forgiveness amount to the lender. If a borrower does not apply for loan forgiveness, payments are deferred 10 months after the end of the covered period for the borrower's loan forgiveness (between 8 and 24 weeks).
- No collateral or personal guarantees are required.
- Neither the government nor lenders will charge small businesses any fees.

27. Further, the SBA explains that the following entities affected by COVID-19 may be eligible for First Draw PPP loans:

- Sole proprietors, independent contractors, and self-employed persons
- Any small business concern that meets SBA's size standards (either the industry size standard or the alternative size standard)
- Any business, 501(c)(3) non-profit organization, 50l(c)(19) veterans organization, or tribal business concern (sec. 31(b)(2)(C) of the Small Business Act) with the greater of:
    - 500 employees, or
    - That meets the SBA industry size standard if more than 500
- Any business with a NAICS code that begins with 72 (Accommodations and Food Services) that has more than one physical location and employs less than 500 per location

[10] *See* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan (last visited May 30, 2024), *and* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan (same).

28. As an initial step, borrowers filled out a *Paycheck Protection Program Borrower Application Form* (OMB Control No. 3245-0407), which contained "Certifications and Authorizations" and required an authorized representative to certify in good faith:

> 1. The Applicant was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.
>
> 2. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.
>
> 3. ***The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*** (emphasis added).
>
> 4. ***The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.*** (emphasis added).
>
> 5. I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.
>
> 6. During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.
>
> 7. ***I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.*** (emphasis added).

8. ***I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.*** (Emphasis added).

29. The SBA published the *Paycheck Protection Program Loans Frequently Asked Questions (FAQs)*, which provides guidance for borrowers and lenders and explains small business concerns (15 U.S.C. 632 (3)) and related exceptions.[11] 15 U.S.C. 632(3) specifically states

> **(3) VARIATION BY INDUSTRY AND CONSIDERATION OF OTHER FACTORS** When establishing or approving any size standard pursuant to paragraph (2), the Administrator shall ensure that the size standard varies from industry to industry to the extent necessary to reflect the differing characteristics of the various industries and consider other factors deemed to be relevant by the Administrator.

30. The SBA utilizes 13 C.F.R. §121.103 to determine "the largest size a business can be to participate in government contracting programs and compete for contracts reserved or set aside for small businesses. Size standards vary by industry and are generally based on the number of employees or average annual receipts."[12] **Table A**, which is premised on relevant questions in the *FAQs*, identifies the exceptions and indicates why ESI does not meet the requirements to qualify as a small business concern.

---

[11] *See* https://www.sba.gov/sites/default/files/2021-01/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf (Jan. 2021) (stating that, "[s]mall business concerns can be eligible borrowers even if they have more than 500 employees, so long as they satisfy the existing statutory and regulatory definition of 'small business concern' ... [or] if it met both tests in the SBA's 'alternative size standard' as of March 27, 2020.").

[12] Small Business Administration, *Size standards*, https://www.sba.gov/federal-contracting/contracting-guide/size-standards (last visited Jun. 3, 2024).

**Table A**

| Relevant SBA Item | ESI |
|---|---|
| Less than 500 employees averaged over the past 12 months. | **No** |
| Maximum tangible net worth of the business is not more than $15 million. | **No**[13] |
| The average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. | **No** |
| Responsibility of the borrower to determine which entities (if any) are its affiliates and determine the employee headcount of the borrower and its affiliates. | **ESI did not accurately determine or report the number of its employees. (*See infra* Table C.)** |
| A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue- based size standard, or meets the tests in SBA's alternative size standard after applying the affiliation rules, if applicable. | **ESI falsified that it was eligible because it did not meet the requisite criteria or the exceptions. (*See infra* Table B.)** |
| Does ESI's North American Industry Classification System (NAICS) code begin with 72? | **No. ESI's NAICS code begins with 23.**[14] |

31. As set forth below, Defendant falsified the documents upon which the SBA and lenders relied. In turn, they received federal funds and knowingly retained the payments instead of returning them to the Government (and repaying the loans at issue) in violation of the False Claims Act.

[13] ESI does not qualify as a small business concern as they do not meet the revenue requirements as its average annual receipts far exceed the $39.5 million threshold, as set forth in the SBA's "size standards in millions of dollars" for the Construction Sector. *See* SBA, *Small Business Size Standards (May 2022)*, available at https://data.sba.gov/dataset/c17e8870-fa85-48a4-8887-9a51b7503711/resource/bbc42a6b-c9f7-4ec9-bc04-cfcd6522cc06/download/sba-table-of-size-standards_effective-may-2-2022_v0.xlsx.

[14] *See* NAICS Code Drill-Down Table, https://www.naics.com/search/ (last accessed Jun. 3, 2024).

## II.     The False Claims Act

32.     The FCA provides for civil liability for "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B)."

33.     Likewise, the reverse false claims provision of the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  *Id*. at § 3729(a)(l)(G).

34.     To show that an entity acted "knowingly" under the FCA, it must be proven that the entity, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  It is not necessary to prove that the entity had the specific intent to defraud the United States.  31 U.S.C. § 3729(b)(l).

35.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729(b)(4). Compliance with a variety of laws and regulations is material to the Government's decision to pay monies under the CARES Act, which created the PPP and the PRF.[15]

---

[15]*See* DOJ, *Eastern District of California Obtains Nation's First Civil Settlement for Fraud on Cares Act Paycheck Protection Program*, https://www.justice.gov/usao-edca/pr/eastern-district-california-obtains-nation-s-first-civil-settlement-fraud-cares-act (Jan. 12, 2021) (SlideBelts, Inc. agrees to $100,000 civil settlement and admission that false statements were made to wrongfully obtain a PPP loan, resolving FCA and FIRREA claims); DOJ, *Bakersfield Medical Practice Agrees to Resolve False Claims Act Allegations Involving Cares Act Paycheck Protection Program*, https://www.justice.gov/usao-edca/pr/bakersfield-medical-practice-agrees-resolve-false-claims-act-allegations-involving (Apr. 21, 2021) (Walia PMC

36.     Under the False Claims Act, the United States is entitled to recover three times the amount of each claim and, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for violations that occurred prior to November 2, 2015, and not less than $11,181 and not more than $22,363 for violations that occurred after November 2, 2015.

37.     There are three broad categories of claims relevant to this case: (1) reverse false claims; (2) factually false claims; and (3) legally false claims.

---

agrees to $70,000 settlement to resolve allegations of false claims made to obtain a loan under the PPP); DOJ, *Virginia Company Agrees to Settle Civil Fraud Allegations for Paycheck Protection Program,* https://www.justice.gov/usao-edva/pr/virginia-company-agrees-settle-civil-fraud-allegations-paycheck-protection-program (Jun. 2, 2021) (KC Investments Group, Inc. agrees to $230,414.65 settlement and to pay monetary penalties under FCA and FIRREA to resolve allegations of fraudulently obtained PPP loans); DOJ, *Owner of Jet Charter Company Settles False Claims Act Allegations Regarding Misappropriation of Paycheck Protection Program Loan*, https://www.justice.gov/opa/pr/owner-jet-charter-company-settles-false-claims-act-allegations-regarding-misappropriation (Aug. 26, 2021) (All in Jets LLC agrees to $287,055 settlement to resolve allegations of misappropriated PPP loan proceeds); DOJ, *COVID-19 Task Force Nets Florida Duct Cleaning Company; Settles False Claims Act Allegations Relating to Improper Paycheck Protection Program Loan*, https://www.justice.gov/opa/pr/covid-19-task-force-nets-florida-duct-cleaning-company-settles-false-claims-act-allegations (Oct. 28, 2021) (Sextant Marine Consulting LLC agrees to $30,000 settlement to settle allegations it violated the FCA by obtaining multiple PPP loans); DOJ, *Atlantic County Company and its Owner Admit Taking Improper Paycheck Protection Program Loan*, https://www.justice.gov/usao-nj/pr/atlantic-county-company-and-its-owner-admit-taking-improper-paycheck-protection-program (Feb. 7, 2022) (Christopher Construction Co. Inc. agrees to $55,325 settlement and admits to violating the FCA by submitting false claims for PPP loans in violation of the program's certification rules); DOJ, *Northern Virginia Company Settles False Claims Act Allegations of Improper Paycheck Protection Program Loan*, https://www.justice.gov/opa/pr/northern-virginia-company-settles-false-claims-act-allegations-improper-paycheck-protection (Feb. 11, 2022) (Zen Solutions Inc. agrees to $31,000 settlement to settle allegations that it violated the FCA by obtaining more than one PPP); DOJ, *HPM Corporation and Owners Accept Responsibility, Agree to Pay Nearly $3 Million in Restitution and Penalties for Fraudulent Covid-19 Relief Loan*, https://www.justice.gov/usao-edwa/pr/hpm-corporation-and-owners-accept-responsibility-agree-pay-nearly-3-million-restituti-0 (Mar. 25, 2022) (HPM Corporation agrees to $2,939,400 settlement and additional responsibilities to response criminal and civil liability in connection with fraudulent PPP loan; owners agree to additional $250,000 penalties to settle FCA liability); DOJ, *New Jersey Pawn Shop and its Owner Settle False Claims Act Allegations Relating to Paycheck Protection Program Loan*, https://www.justice.gov/opa/pr/new-jersey-pawn-shop-and-its-owner-settle-false-claims-act-allegations-relating-paycheck (Apr. 21, 2022) (Daniel Markus Inc. agrees to $50,000 settlement to resolve allegations under the FCA and FIRREA for fraudulently obtaining multiple PPP loans); *see also United States ex rel. Berkley v. Ocean State, LLC*, 2023 WL 3203641, at *6–7 (D.R.I. May 2, 2023) (recent District Court decision denying a motion to dismiss similar allegations under FCA subsections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(G)).

38. A reverse false claim occurs when any person knowingly and improperly avoids or decreases an "obligation" to pay the Government in violation of 31 U.S.C. § 3729(A)(l)(G).

39. A factually false claim is defined as an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *U.S. ex rel. Badr v. Triple Canopy, Inc.*, 950 F.Supp.2d 888, 896 (E.D. Va. 2013), *aff'd in part and rev'd in part on other grounds*, *United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017).

40. Legally false claims are predicated on an express or implied false certification of compliance with a regulation, statute, or contract term. *See Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 186 (2016) (establishing that both express and implied legally false claims may form a valid basis for FCA liability). When evaluating a legally false claim, the Supreme Court in *Universal Health* required that a plaintiff-relator substantiate that compliance with the regulations was material to the Government's decision to pay and that the defendant had knowledge of the falsity of the claim. Defendants' actions are material to the Government's decision to pay.

## III. ESI'S SCHEME AND FRAUDULENT CONDUCT

41. Defendant's false and fraudulent statements, which at a minimum constitute reckless disregard for truth or falsity of the information, violate the False Claims Act. Defendant fraudulently engaged in, *inter alia*,

- Knowingly and intentionally making false certifications on the *Paycheck Protection Program Borrower Application* that the number of full-time equivalent employees on the Applicant's payroll, as well as the dollar amounts of payroll costs, was truthful and accurate;

- Knowingly and intentionally making false certifications on the *Paycheck Protection Program Borrower Application* that the information provided in its applications and in the supporting documents were true and accurate in all material aspects; and
- Knowingly and intentionally retaining monies fraudulently received from the Government instead of returning the monies as required under the FCA.

42. There is a significant disparity between ESI's actual revenues generated and actual number of employees, compared to the information that the lender, Idaho First Bank, as well as the SBA, relied upon when approving and backing the loans.

**A. ESI's 2020 Firing and Hiring Activity**

43. On Wednesday, March 25, 2020, Idaho Governor Brad Little issued a state-wide stay at home order, with certain exceptions given to workers in industries deemed "essential." As a construction company, ESI was deemed an essential business. The next day, on March 26, 2020, the ESI Safety Director issued an email addressing the ability to work and travel and emphasizing that ESI's employees were deemed essential.

44. On Friday, March 27, 2020, between the morning and mid-afternoon, ESI notified a significant number of field and office staff (approximately 80-100 employees) that the company must "temporarily reduce its workforce," as the COVID-19 pandemic had impacted ESI's business. The effective date on the notification was April 1, 2020. Relator was included in this group after working for ESI for nearly 22 years. The effect of the layoffs was that ESI's number of employees was reduced to less than 500 for the first time in years to approximately 490 employees. Moreover, the statement that the COVID-19 pandemic had adversely affected ESI's business was false and pretextual.

45.     Confidential Witness One ("CW1"), who worked for ESI as a project coordinator and project assistant beginning in 2015, was also included in this group.  CW1 recalled feeling secure in his/her job as the pandemic unfolded because no ESI jobs were being delayed or cancelled.  ESI even informed CW1 and other employees that their jobs were safe because they were part of an industry that was essential.  CW1 emphasized that the March 27 layoffs did not appear necessary or justifiable under the circumstances.

46.     That same day (on March 27, 2020), ESI sent a separate email to remaining staff stating, "[O]ur jobsites never closed!  Our hope is that conditions will recover within the next 120 days to the point where we can recall all of our co-workers back to active duty."

47.     Only a few days after the layoffs (and confirming the pre-contextual nature of the lay-offs), ESI posted a notice titled "Looking to Join the ESI Team?" in its offices by the elevators with instructions on how to apply online due to COVID-19.



**(Job posting following COVID-19 layoffs)**

48. Confidential Witness Two ("CW2"), who worked at ESI's corporate office as a project coordinator from 2014 until the March 27 layoffs, learned from former colleagues who were still at ESI that the company immediately posted flyers for open office positions.

49. ESI also posted three job openings on LinkedIn for immediate openings, including for two high level positions which were vacated in the March 27 layoff. Indeed, ESI continued to regularly post about job openings and hire new people after the layoff, even though only less than 10% of the people let go on March 27 were ultimately rehired). CW1 even recalled that the company advertised and held a large hiring event, similar to a job fair, in April 2020. Clearly, ESI required more than 490 employees, as it well knew.

50. ESI's lay-off in late March, 2020 and its historical employee count (explained below) indicate that the company laid off approximately 100 employees just before April 1, 2020 in order to claim that it only employed 490 workers and, therefore, met the threshold requirement for SBA PPP Loan approval (*i.e.*, that ESI did not have more than 500 employees). The scheme worked. On April 12, 2020, ESI received approximately $8.6 million from Idaho First Bank for PPP loan number 4034667109. ESI's filings asserted that approximately $8.6 million was to be utilized for payroll expenses for 490 employees. ESI did not claim expenses for rent, mortgage payments, healthcare, insurance, etc.

### B. Falsification of the Number of Employees, Available Cash/Earnings, and Layoffs

51. Numerous sources substantiate that ESI's statements in its PPP Borrower Application were knowingly false and fraudulent, including the examples below. ESI falsified this information regarding its revenue and employee count to qualify for a PPP loan under the SBA conditions.

52. An Idaho Business Review "Book of Lists" for 2019-2020 named ESI number one (ranked by number of employees) as a General Contractor. At the time, ESI employed 500 employees and its 2018 revenue was listed as $410,750,530.

53. Additionally, industry publication Engineering News Record ("ENR") publishes a list of the "Top 400 Contractors" in May of each year, reporting the previous year's data. The companies featured on the list self-report data to the publication. ESI has been featured on this list since 2005 and self-reported the data found in **Table B** in the 2019 through 2024 editions.

**Table B**

| Year | Revenue | New Contracts |
|---|---|---|
| 2018 | $401.8 million | 216.3 |
| 2019 | $426.4 million | 241.6 |
| 2020 | $473 million | 297 |
| 2021 | $469.7 million | 944 |
| 2022 | $866 million | 626 |
| 2023 | $850 million | 518 |

54. Moreover, ESI's website and other various internet archives confirmed that the company has never had less than 500 employees from at least 2018 to present day. As indicated by internet archives capturing over 200 historical pages for ESI's website (www.esiconstruction.com), ESI has actively publicized its number of employees on its website. Archive captures from 14 different occasions between February 18, 2019, and August 3, 2020 indicate that for the entire duration of 2019, ESI publicized that it maintained between 500 and 550 employees. **Table C** details the number of employees advertised on the ESI website from February 18, 2019, through the present.

**Table C**

| Date | Number of Employees on Website |
|---|---|
| 2/18/2019 | 550 |
| 4/19/2019 | 500 |
| 5/4/2019 | 500 |
| 6/19/2019 | 500 |
| 7/15/2019 | 500 |
| 7/30/2019 | 500 |
| 8/19/2019 | 500 |
| 10/6/2019 | 500 |
| 10/14/2019 | 500 |
| 8/3/2020 | 550 |
| 11/22/2021 | 600 |
| 5/30/2024 | 925 |

55. Several examples of the number of employees advertised on ESI's website from 2019 to 2021 corroborate these numbers:

**(Screen capture from ESI website on 2/18/2019 listing 550 employees)**



**(Screen capture from ESI website on 10/14/2019 listing 500 employees)**



**(Screen capture from ESI website on 8/3/2020 listing 550 employees)**



**(Screen capture from ESI website on 11/22/2021 listing 600 employees)**

56.     ESI even celebrated when it reached 500 employees in 2018.  On June 8, 2018,

ESI posted the image below to its Instagram account announcing that the company had reached

500 employees. The caption of the image read, ***"ESI now has 500 employees! Welcome to our team #esiconstruction."*** The image was also uploaded to the ESI website on six separate occasions from September 5, 2018, through October 18, 2018.

500

**(ESI's 500th employee promotional image)**

57. Various CWs also confirmed that ESI had more than 500 employees long before applying for the PPP loan. Confidential Witness Three ("CW3"), who worked for ESI for almost 13 years as a Facility Security Officer, explained that many bids/proposals required bidders to provide their employee counts in their bid paperwork, and that he/she had been listing employee numbers well over 500 since at least 2018. CW3 would verify the employee number for these proposals with ESI's payroll department. CW2 also recounted that ESI had reached 500 employees well before the pandemic. In fact, ESI made so much noise about hiring its 500th employee that both CW1 and CW2 remembered the name of this individual. CW2 believed ESI conducted the layoff specifically to drop the company's employee count below 500 and thereby claim PPP loans.

58. As set forth above, ESI was required to truthfully attest to the "Certifications and Authorizations" of the *Paycheck Protection Program Borrower Application Form* (OMB Control

No. 3245-0407). In reality, ESI was not a "small business" for purposes of the SBA and did not meet items 3, 4, 7, and 8 of the PPP certifications. Yet ESI submitted its signed application form and received millions of dollars in funds.

### C. ESI Had No Need for a PPP Loan

59. Between April 1 and April 9, 2020, ESI applied for and, on April 12, 2022, obtained its PPP loan in the amount of approximately $8.6 million from Idaho First Bank—a financial institution with which, to Relator's and other witnesses' knowledge, ESI had never done business with because Washington Federal[16] was and continues to be ESI's longtime bank due to its relationship with a C-Level Executive at ESI. ESI's PPP loan details appear below in **Table D**.

**Table D**

| **ESI PPP Loan Details** | |
|---|---|
| **Loan Number:** | <REDACTED> |
| Date Approved: | 4/12/2020 |
| SBA Office Code: | 1087 |
| Processing Method: | PPP |
| Borrower Name: | Engineered Structures, Inc. |
| Borrower Address: | 3330 E. Louise Dr, Suite 300 |
| Borrower City: | Meridian |
| Borrower State: | ID |
| Borrower Zip: | 83642-5047 |
| Loan Status Date: | |
| Loan Status: | Exemption 4 |
| Term: | 24 |
| SBA Guaranty Percentage: | 100% |
| Initial Approval Amount: | $8,607,900.00 |
| Current Approval Amount: | $8,607,900.00 |
| Undisbursed Amount: | $0.00 |

[16]Upon information and belief, ESI did not apply through Washington Federal because the fraudulent nature of ESI's representations regarding its number of employees would have been apparent to ESI's long-time banker. Washington Federal, which issued over 800 PPP loans in 2020, would certainly have been able to issue a PPP loan for ESI. *See* https://www.cnn.com/projects/ppp-business-loans/search?lender=Washington%20Federal%20Bank,%20National%20Association. The fact that ESI chose not to apply for a PPP loan through its normal lender – which was issuing PPP loans at that very time – is suspicious under all of the circumstances.

| | |
|---|---|
| Franchise Name: | |
| Servicing Lender Location Id: | 43627 |
| Servicing Lender Name: | Idaho First Bank |
| Servicing Lender Address: | 475 E Deinhard Ln |
| Servicing Lender City: | McCall |
| Servicing Lender State: | ID |
| Servicing Lender Zip: | 83638-4800 |
| Rural Urban Indicator: | U |
| Hubzone Indicator: | Y |
| Lmi Indicator: | Y |
| Business Age Description: | Existing or more than 2 years old |
| Project City: | Meridian |
| Project County Name: | Ada |
| Project State: | ID |
| Project Zip: | 83642-5047 |
| Cd: | Id-01 |
| Jobs Reported: | 490 |
| Naics Code: | 236220 |
| Utilities Proceed: | |
| Payroll Proceed: | $8,607,900.00 |
| Mortgage Interest Proceed: | |
| Rent Proceed: | |
| Refinance Eidl Proceed: | |
| Health Care Proceed: | |
| Debt Interest Proceed: | |
| Forgiveness Amount: | $8,706,478.14 |
| Forgiveness Date: | 6/11/2021 |

60.     In its PPP Borrower Application Form, ESI falsely attests under Item 2 that "[t]he current economic uncertainty makes this loan necessary to support the ongoing operations of the applicant."  However, ESI did not experience any semblance of financial hardship before, during, or after 2020.

61.     Relator has personal knowledge that ESI's net earnings were in excess of $6 million for the years prior to the pandemic, which is consistent with ESI's December 31, 2020 revenues, as outlined in Table B.

62.     Confidential Witness Four ("CW4"), who worked for ESI until August 2021 as a Senior Staff Accountant, confirmed that ESI's bottom line did not suffer in 2020, which was a

great year for the company. In fact, ESI's line of credit in 2020 was $10 million and carried no balance.

63. This financial history reveals why ESI could not seek an ESI loan from its own banking institution and instead submitted false certifications to receive a loan from an unfamiliar entity.

64. CW1 recalled that at ESI's 2020 "State of the Company" meeting, an annual company-wide event which occurred shortly before the March 27 layoffs, ESI executives were bragging about being the "biggest construction company in the valley" and that "everything was great." CW1 was not aware of any projects that were losing money, delayed, halted, or canceled because of the COVID-19 pandemic. To the contrary, ESI had large projects for Fred Meyer and Whole Foods at the time of the pandemic and, according to CW1, was "winning a bunch of jobs," many of which were multi-million-dollar contracts.

65. CW2 similarly recalled the owners of ESI speaking about "how good everything was going" at the 2020 State of the Company meeting, noting that the company had a backlog of projects to complete. According to CW2, only one project was cancelled during the pandemic, with all others proceeding as scheduled. CW2 did not believe ESI was struggling financially at any time during the pandemic, as it had many projects underway.

**D. The Use of the PPP Loan Proceeds**

66. ESI clearly did not need a PPP loan to subsidize its regular operations. What it did need, apparently, was a private jet. Prior to COVID-19 and the receipt of its PPP funds, ESI had an arrangement to use another entity's private jet but did not own one itself. Yet, just after ESI received its $8.6 million PPP loan, it registered ownership of a newly-purchased 11-seat

2012 Cessna525C with the FAA on November 3, 2020 for non-charter purposes (Serial No. 525C0091).[17]

**(Pictures of a Cessna525C, both inside and outside)**

67. On June 11, 2021, ESI received a PPP loan forgiveness of $8,706,478.00, despite submitting false and fraudulent statements on its initial application and using the funds during the loan period to purchase the Cessna525C.

68. In sum, like many other bad-faith actors who took advantage of the COVID-19 pandemic, ESI submitted false and fraudulent certifications and documentation, utilized the PPP loan funds for purposes outside the scope of those expressly stated on its PPP Borrower Application and prohibited by the eligibility requirements, and defrauded the Government of millions. To compound matters, instead of returning the ill-gotten funds to the United States Government, ESI knowingly retained the funds in violation of the False Claims Act.

69. Relator has detailed herein Defendant's knowing and intentional false, fraudulent, and deficient certifications and attestations, for which a loan in excess of $8.6 million was obtained by ESI. Specific examples of the conduct illustrate Defendant's false statements and/or fraudulent conduct, which were made (at a minimum) with reckless disregard for the truth or falsity of the information—which is material to the Government's payment and forgiveness of PPP loans based on previous FCA settlements and criminal prosecutions concerning PPP fraud.

---

[17] *See* https://flightaware.com/resources/registration/N271ES (last accessed Jun. 3, 2024) (*citing* https://registry.faa.gov/Aircraftlnquiry/Search/NNumberResult?nNumberTxt=271ES (last accessed Jun. 3, 2024)).

Defendant’s alleged conduct is particularly egregious because businesses that truly are small businesses or that met the requisite exceptions and requirements under the PPP were harmed by bad actors such as Defendant wrongfully claiming funding.

**COUNT I**
False Claims Act – 31 U.S.C. 3729(a)(1)(A)
(*Violations of the FCA: Presenting Fale Claims for Payment)*

70. Relator repeats and realleges the facts and allegations above as fully set forth herein.

71. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

72. Through the acts described above, Defendant and its agents and employees knowingly presented and caused to be presented to the Government materially false or fraudulent claims for PPP loan for the receipt of Government funds.

73. The Government, unaware of the material falsity of the claims made or caused to be made by the Defendant, approved, paid, and participated in payments made by the Government's fiscal intermediaries for PPP loan(s) that otherwise would not have been allowed.

74. By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

**COUNT II**
False Claims Act – 31 U.S.C. § 3729(a)(1)(B)
*(Violations of the FCA: Use of False Statements)*

75. Relator repeats and realleges the facts and allegations above as if fully set forth herein.

76. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

77. Defendant, knowingly or acting with deliberate ignorance or reckless disregard for the truth, presented, either directly or indirectly, false, or fraudulent claims for payment to Government programs in connection with the false certifications and attestations made on the PPP application(s) and its unauthorized use of Government funds.

78. Defendant knowingly made, used, or caused to be made or used false records and statements to get false or fraudulent claims approved for payment by the Government, in violation of 31 U.S.C. § 3729(a)(l)(B).

79. The Government, unaware of the falsity for the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

**COUNT III**

False Claims Act – 31 U.S.C. § 3729(a)(1)(G)

*(Violations of the FCA: Failure to Repay Government Funds)*

80. The Relators repeats and realleges the facts and allegations above as if fully set forth herein.

81. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

82. Defendant knowingly made, used, or caused to be made or used false records and statements material to an obligation to pay or transmit money to the Government or knowingly made, used, or caused to be made or used false records and statements material to improperly avoid or decrease an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3279(a)(l)(G).

83. Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

84. Defendant’s fraudulent actions in failing to return monies due to the Government (and repay the loans at issue) was independent of its fraudulent conduct in obtaining the PPP loans in the first place.

85. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays, on behalf of the United States of America, that judgment be entered in favor of the United States and the State and against Defendant, as follows:

A. That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729, *et seq*.;

B. That this Court enter judgment against Defendant in an amount equal to treble (three times) the damages the Government has sustained because of Defendant's actions, plus a civil penalty of not less than $10,781.00 and not more than $23,607.00 for each violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016), 87 Fed. Reg. 2187 (Jan. 13, 2022);

C. That Relater be awarded the maximum amount allowed pursuant to§ 3730(d) of the FCA;

D. That Relator and his attorneys and the Government be awarded all costs of this action, including attorneys' fees and expenses; and

E. That Relator be awarded such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Relator, on behalf of the United States, demands a trial by jury on all tissues so triable.

Dated: June 4, 2024

Respectfully submitted,

*/s/ Patricia D. Ryan*
Patricia D. Ryan
Virginia Bar No. 35945 (EDVA – Admitted)
6106 Harvard Ave., PO Box 633
Glen Echo, Maryland 20812
Email: patriciaryan@pdrlaw.com
Telephone: (240) 481-6284

James E. Miller
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jemiller@millershah.com
*Admitted Pro Hac Vice*

Bruce D. Parke
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
bdparke@millershah.com
*Admitted Pro Hac Vice*

Rachel V. Rose – Attorney at Law, PPLC
P.O. Box 22718
Houston, Texas 77227
Email: rvrose@rvrose.com
Telephone: (713) 907-7442
*Admitted Pro Hac Vice*

***Attorneys for Relator***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of record.

*/s/ Patricia D. Ryan*
Patricia D. Ryan