**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.* KAREN BLOOMFIELD,** <br><br> *Plaintiff-Relator*, <br><br> **v.** <br><br> **ENGINEERED STRUCTURES, INC.,** <br><br> *Defendant*. | Civil Action No. 1:22-cv-00789-DJN-IDD |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    I.     The CARES Act and PPP Loans ...................................................................... 3

    II.    ESI's Successful, 500+ Employee Business .................................................... 3

    III.   ESI's Business Continued Uninterrupted During the COVID-19 Pandemic .................. 4

    IV.   ESI's Fraudulent PPP Loan Application, Use of Proceeds, and Forgiveness ................. 5

    V.    Materiality of PPP Loan Fraud ....................................................................... 6

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................... 9

    I.     The FAC sufficiently alleges that ESI falsified its employee count on its PPP loan application. ............................................................................................................ 10

    II.    The FAC sufficiently alleges that ESI falsely certified the economic necessity of the PPP loan. ................................................................................................................ 13

     A.    Relator alleges ESI had no economic need for a PPP loan at the time it applied. ........ 14

     B.    Allegations regarding ESI's business before and after the PPP loan application indicate ESI had no economic necessity for the loan. ............................................................... 15

    III.   The FAC sufficient alleges that ESI fraudulently avoided an obligation to pay the Government. .............................................................................................................. 20

CONCLUSION ............................................................................................................... 21

CERTIFICATE OF SERVICE ....................................................................................... 23

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Anderson v. Sara Lee Corp.*,
    508 F.3d 181 (4th Cir. 2007)...................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................7

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................7, 17

*Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*,
    995 F. Supp. 2d 512 (E.D. Va. 2014) .................................................................17

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ...............................................................................................7

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999)..........................................................................8, 14

*In re Fresh Acquisitions, LLC*,
    2024 WL 2232432 (Bankr. N.D. Tex. May 16, 2024)....................................7, 19

*Johnson v. Mueller*,
    415 F.2d 354 (4th Cir. 1969)................................................................................8

*Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*,
    684 F.3d 462 (4th Cir. 2012)..............................................................................17

*Nario v. Nat'l OnDemand, Inc.*,
    2022 WL 1241435 (M.D.N.C. Apr. 27, 2022) ...........................................9, 12, 18

*Ostrzenski v. Seigel*,
    177 F.3d 245 (4th Cir. 1999)................................................................................8

*Pencheng Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014) ........................................................................20

*Republican Party of N.C. v. Martin*,
    980 F.2d 942 (4th Cir. 1992)................................................................................8

*United States ex rel. Berkley v. Ocean State, LLC*,
    2023 WL 3203641 (D.R.I. May 2, 2023) .........................................................20, 21

*United States ex rel. Branscome v. Blue Ridge Home Health Servs., Inc.*,
    2018 WL 1309734 (W.D. Va. Mar. 13, 2018)....................................................20

*United States ex rel. Grant v. United Airlines Inc.*,
    912 F.3d 190 (4th Cir. 2018)................................................................................8

*United States ex rel. Miller v. Manpow, LLC*,
    2022 WL 18397530 (C.D. Cal. Sept. 14, 2022) ..............................................9, 12

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
    707 F.3d 451 (4th Cir. 2013)................................................................................8

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
    612 F.3d 724 (4th Cir. 2010)................................................................................9

*United States ex rel. Rostholder v. Omnicare, Inc.*,
    745 F.3d 694 (4th Cir. 2014)................................................................................9

*United States ex rel. Wilson v. Kellog Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008)..............................................................................14

*United States v. Brooks*,
   2022 WL 1812254 (E.D. Va. Jun. 1, 2022) .................................................. 15, 21
*United States v. Eghbal*,
   475 F. Supp. 2d 1008 (C.D. Cal. 2007) .............................................................. 9
*United States v. ManPow LLC*,
   2024 WL 305699 (C.D. Cal. Jan. 3, 2024) ....................................................... 18

**Statutes**

31 U.S.C. § 3729(a)(1) ........................................................................................... 9
31 U.S.C. § 3729(a)(1)(A) ...................................................................................... 9
31 U.S.C. § 3729(a)(1)(B) ................................................................................. 9, 20
31 U.S.C. § 3729(b)(4) ........................................................................................... 6
31 U.S.C. §§ 3729-33 ............................................................................................. 1
Pub. L. 116-136, 134 Stat. 281 (2020) ................................................................... 1
§ 3729(A)(1)(G) ............................................................................................... 20, 21

**Rules**

Federal Rules of Civil Procedure 9(b) ................................................................ 2, 8
Federal Rules of Civil Procedure 12(b) .................................................................. 2

On behalf of the United States of America (the "Government"), Plaintiff-Relator, Karen Bloomfield ("Relator"), respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss Relator's Amended Complaint ("Motion," ECF No. 41) and supporting Memorandum of Law ("MOL," ECF No. 41-1) filed by Defendant, Engineered Structures, Inc. ("ESI" or "Defendant").

## <u>INTRODUCTION</u>

Relator brings this civil action on behalf of the Government pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA"), to recover payments the Government made to Defendant as a result of Defendant's knowing and reckless submission of false and fraudulent claims in blatant abuse of the Paycheck Protection Program ("PPP") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020).

The COVID-19 Pandemic was a time of austerity and anxiety for many American businesses, but ESI was not one of them. Allowed to continue working because of their "essential business" designation, ESI did not suffer a slow-down in work, much less in profits. Yet instead of being grateful for their relative good fortune, Defendant decided to fraudulently exploit its position by taking advantage of benevolent emergency policies enacted to preserve businesses in crisis. Knowing it did not meet the criteria to receive a PPP loan, ESI falsified the information on its application, obtained a PPP loan, and, in an additional violation of the FCA, enjoyed forgiveness of the wrongfully obtained loan. Now, in its latest attempt to avoid accountability, ESI files a meritless motion to dismiss Relator's well-pled First Amended Complaint ("FAC," ECF No. 39).

Defendant focuses on Relator's inclusion of social media and website posts to support her claims, entirely ignoring her direct factual allegations of fraudulent statements and the damning

accounts of Confidential Witnesses who corroborate Relator's claims.  But the Court should give no credence to Defendant's invitation to disregard Relator's well-pled factual allegations and to err by wrongly accepting Defendant's interpretation of the facts as somehow true – despite the FAC's explicit and detailed pleading to the contrary.  Notwithstanding Defendant's attempts to escape its actual facts, the FAC paints a clear picture of a fraudulent scheme, including how ESI intentionally manipulated its employment figures to qualify for a PPP loan, fraudulently obtained $8,607,900.00 in federal funds despite having no financial need for such significant support, unlawfully used the PPP loan proceeds to purchase a private jet instead of maintaining employees and payroll, and, instead of paying back the windfall it received from American taxpayers, exacerbated its benefit by receiving loan forgiveness in the amount of $8,706,478.00. In short, Defendant took advantage of a program explicitly designed to address the legitimate hardships faced by small businesses during the COVID-19 pandemic and defrauded the Government of millions of dollars during a time of global economic suffering in unprecedented ways.

In the words of Attorney General Merrick B. Garland, ESI and all those who "seek to exploit the pandemic for personal gain" must be held accountable "to protect vulnerable populations, and to safeguard the integrity of taxpayer-funded programs."[1]  The FAC easily satisfies the pleading standards established under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and, therefore, the Court should deny the Motion.

---

[1]Press Release, Dep't of J., Justice Department Announces Director for COVID-19 Fraud Enforcement (Mar. 10, 2022), https://www.justice.gov/opa/pr/justice-department-announces-director-covid-19-fraud-enforcement.

**BACKGROUND**

**I.      The CARES Act and PPP Loans**

Section 1102 of the CARES Act created the PPP, authorizing billions of dollars in forgivable loans to small businesses struggling to pay employees and other business expenses. FAC ¶¶ 1, 15.  Under the PPP, businesses with fewer than 500 employees could be eligible to receive forgivable loans of up to $10 million to be used for payroll, rent, mortgage interest, utilities, and other overhead expenses.  *Id.* ¶ 16.  The U.S. Small Business Association ("SBA") administers the PPP and guarantees all PPP loans.  *Id.* ¶ 15.

To receive a PPP loan, a business must fill out a Borrow Application Form, OMB Control No. 3245-0407 ("BAF") with data including the business's number of employees, average monthly payment expenses, and the intended purpose of the loan funds.  *Id.* ¶ 21.  The BAF requires the applicant business to certify it is eligible to receive a PPP loan under the then-current SBA rules and that all loan funds will be used exclusively for the purposes specified in the application.  *Id.* ¶ 22.  Applicant businesses must also certify that the loan is necessary to support their ongoing operations; that the loan funds will be used to retain workers and maintain payroll or make payments on mortgage interest, lease obligations, or utilities; and that the information provided in applying for the PPP loan is true and accurate, under penalty of federal liability.  *Id.* ¶¶ 23, 28.  PPP loans stopped being issued on May 31, 2021, but borrowers could apply for PPP loan forgiveness if they met the SBA's employee retention criteria and used the loan proceeds for eligible expenses.  *Id.* ¶¶ 25–26.

**II.      ESI's Successful, 500+ Employee Business**

ESI is a general contractor in the construction services industry.  *Id*. ¶¶ 13, 52.  Since June 2018, ESI has had at least 500 employees, revenues of greater than $400 million, and more than 200 annual new contractors.  *Id*. ¶¶ 52–55.  ESI has actively promoted its size and success

on its website and social media, even posting an image to its Instagram account on June 8, 2018, to celebrate reaching 500 employees. *Id*. ¶¶ 54–56.  Confidential Witness 3 ("CW3") explained that he/she often had to provide ESI's employee count on bid paperwork, and that he/she had listed employee numbers well above 500 since at least 2018. *Id*. ¶ 57.  CW3 confirmed employee count numbers with ESI's payroll department before submitting bid paperwork. *Id*.

At the 2020 annual "State of the Company" meeting, which occurred shortly before the COVID-19 Pandemic reached the United States, Confidential Witness One ("CW1") recalled ESI executives congratulating everyone because "everything was great" and they were the "biggest construction company in the valley." *Id.* ¶ 64.  Confidential Witness Two ("CW2"), who attended the same "State of the Company" meeting, similarly remembered the owners of ESI speaking about "how good everything was going" and how they had a backlog of projects. *Id.* ¶ 65.  As explained below, COVID-19 did not interrupt this success.

## III.    ESI's Business Continued Uninterrupted During the COVID-19 Pandemic

On March 25, 2020, Idaho Governor Brad Little issued a state-wide stay-at-home order. *Id*. ¶ 43.  However, as a construction company, ESI was deemed an "essential" business and was permitted to continue work and travel. *Id*.  This is exactly what ESI did.  In fact, according to CW1, ESI did not have to delay or cancel any projects due to the pandemic, had large projects for Fred Meyer and Whole Foods at that time, and won "a bunch of jobs," many of which were multi-million-dollar contracts. *Id*. ¶¶ 45, 64.  CW2 recalled only a single project being cancelled during the pandemic, with all other projects proceeding as scheduled and no semblance of financial struggle. *Id*. ¶ 65.  ESI even promoted the fact that its "jobsites never closed" and actively sought job applicants as early as April 2020. *Id*. ¶¶ 46–49.

The COVID-19 Pandemic did not change ESI's upwards business trajectory.  Rather, according to industry publication Engineering News Record, ESI took in $473 million in revenue

and 297 new contracts in 2020, both increases from 2019.  *Id.* ¶ 53.  The company received an incredible 944 new contracts in 2021, no doubt contributing to its huge jump in revenue in 2022, which ESI reported as $866 million.  *Id.*  Confidential Witness Four ("CW4"), a Senior Staff Accountant for ESI until August 2021, reported that the company suffered no loss to its bottom line in 2020, which was actually a great year for ESI.  *Id.* ¶ 62.  In fact, ESI was doing so well that it carried no balance on its $10 million line of credit.  *Id.*

## IV.    ESI's Fraudulent PPP Loan Application, Use of Proceeds, and Forgiveness

Promptly following announcements that the CARES Act, including the PPP, had been signed into law, ESI sent temporary termination notices to approximately 80 to 100 employees, dropping the company's employee count below 500 for the first time in years.  *Id.* ¶ 44.  As early as April 1, ESI began the process of applying for a PPP loan.  *Id.* ¶ 59.  Instead of working with its longtime bank, Washington Federal, which was a qualified PPP lender but had an intimate knowledge of ESI's business metrics and financials, ESI applied with Idaho First Bank.  *Id.* ¶¶ 59, n.16, 63.

In making the PPP loan application, ESI necessarily completed a BAF and certified that it needed the loan to maintain operations, would use the loan for authorized business purposes, and that all the information provided in connection with its application was true and accurate.  *Id.* ¶¶ 23–24, 28, 58.  ESI certified under item 2 of the BAF that the "current economic uncertainty makes this loan necessary to support the ongoing operations of the applicant," despite there being no indication that the "current economic uncertainty" would have any effect on ESI's "essential" business.  *Id.* ¶ 60.  ESI's actual PPP loan application filings state that it would use the loan proceeds to cover the payroll expenses of its 490 employees.  *Id.* ¶ 50.

On April 12, 2020, ESI received a PPP loan, loan number 4034667109, for approximately $8,607,900.00 from Idaho First Bank.  *Id.* ¶¶ 50, 59.  Shortly thereafter, ESI purchased an 11-seat

2012 Cessna 525C private jet, which it registered with the Federal Aviation Administration ("FAA") on November 3, 2020. *Id.* ¶ 66. Despite stating its intent to rehire "temporarily" terminated employees and its certification that it would use PPP loan proceeds for payroll expenses, ESI rehired less than 10% of the people laid off on March 27, 2020. *Id.* ¶ 49. ESI's PPP loan, including interest, was forgiven on June 11, 2021, in the amount of $8,706,478.14. *Id.* ¶¶ 59, 67.

## V.      Materiality of PPP Loan Fraud

The FCA provides for civil liability for "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B)." *Id.* ¶ 32. "Material" in the FCA context means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* ¶ 35 (quoting 31 U.S.C. § 3729(b)(4)). While Defendant does not challenge that truthfulness and accuracy in PPP loan applications are material to the Government's decision to grant such loans, Relator notes there is ample evidence to indicate that this is the case. Indeed, the SBA Office of Inspector General and U.S. Attorneys from districts across the country have been investigating and charging PPP loan recipients with fraud since 2021, resulting in millions of dollars in settlements. *See Id.* ¶ 35 n.15.[2] Earlier this year, Principal Deputy Assistant Attorney General Brian M. Boynton

---

[2]McInnis Law, *PPP Whistleblower Lawsuit against The Raleigh Racquet Club Settles for $354,085*, PR Newswire (June 24, 2024), https://www.prnewswire.com/news-releases/ppp-whistleblower-lawsuit-against-the-raleigh-racquet-club-settles-for-354-085--302180991.html; Press Release, Dep't of J., *U.S. Attorney Announces $4.6 Million False Claims Act Settlement with Restaurants, Fur Apparel Companies, and Their Owners and Managers for Submitting False Information to Obtain Paycheck Protection Program Loans* (June 20, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-46-million-false-claims-act-

confirmed that pandemic fraud remains a priority for the Department of Justice, explaining that the "False Claims Act has been a critical part of the department's COVID-19 Fraud Enforcement Task Force and has been used to purse a variety of pandemic related fraud schemes," with "significant focus" devoted to the PPP.[3]  The pervasive problem has also caught the attention of the federal judiciary.  *See In re Fresh Acquisitions, LLC*, 2024 WL 2232432, at \*32 (Bankr. N.D. Tex. May 16, 2024) ("The Court is aware that abuse of PPP loans has been an alarming trend across the country.").

## LEGAL STANDARD

In ruling on a 12(b)(6) motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint."  *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).  A viable complaint must contain only "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 942, 952 (4th Cir. 1992).  Dismissal is appropriate

---

settlement-restaurants-fur-apparel; Press Release, Dep't of J., *Kabbage Inc. Agrees to Resolve Allegations that the Company Defrauded the Paycheck Protection Program* (May 13, 2024), https://www.justice.gov/opa/pr/kabbage-inc-agrees-resolve-allegations-company-defrauded-paycheck-protection-program; Press Release, Dep't of J., *Solar Energy Company Agrees to Resolve False Claims Act Allegations Related to Paycheck Protection Program Loan* (May 9, 2024), https://www.justice.gov/usao-wdtx/pr/solar-energy-company-agrees-resolve-false-claims-act-allegations-related-paycheck.

[3]Principal Deputy Assistant Attorney General Brian M. Boynton, Address at 2024 Federal Bar Association Qui Tam Conference (Feb. 22, 2024), *at* https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-brian-m-boynton-delivers-remarks-2024.

only if "it appears to be a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proven in support of its claim." *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir. 1969).  Moreover, when considering a motion to dismiss, courts must view the complaint "in the light most favorable to the plaintiff." *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999).

Actions alleging fraud or mistake, like the FAC, are additionally evaluated under the particularity pleading standard set for in Federal Rule of Civil Procedure 9(b).  "To satisfy Rule 9(b), a plaintiff asserting a claim under the [FCA] 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained.'"  *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 456–57 (4th Cir. 2013) (citation omitted).  "Alternatively, a plaintiff can allege a pattern of conduct that would 'necessarily have led[ ] to submission of false claims' to the government for payment."  *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018) (quoting *Takeda*, 707 F.3d at 457).  The purposes of Rule 9(b) are to "ensure[] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of," to "protect defendants from frivolous suits," to "eliminate fraud actions in which all the facts are learned after discovery," and to "protect[] defendants from harm to their goodwill and reputation."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  Thus, a court "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Id.*

8

## ARGUMENT

"The FCA is designed to prevent fraud and reflects Congress' broad goal 'to protect the funds and property of the government.'" *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014) (quoting *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010)).  An entity is liable to the Government under 31 U.S.C. § 3729(a)(1), if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *Id.*  It is settled that "making a false or fraudulent statement to obtain a government-funded loan violates the FCA." *Nario v. Nat'l OnDemand, Inc.*, 2022 WL 1241435, at *3 (M.D.N.C. Apr. 27, 2022); *see United States v. Eghbal*, 475 F. Supp. 2d 1008, 1013–16 (C.D. Cal. 2007) (finding the defendants liable under the FCA when they made false statements on HUD-insured loan applications).

Relator asserts Defendant violated subsections (A), (B), and (G) of 31 U.S.C. § 3729(a)(1) by including materially false statements in its PPP loan application, wrongfully receiving a PPP loan, and, instead of repaying the loan, fraudulently applying for and receiving loan forgiveness.  Defendant raises the same objection to Relator's causes of action under § 3729(a)(1)(A) and § 3729(a)(1)(B)—namely, that the "facts" do not sufficiently demonstrate that ESI fraudulently misreported its employee count on its PPP loan application.[4]  However, Defendant does little more than argue an alternative set of "facts," directly disputing the merits of Relator's factual allegations and improperly asking the Court to do the same.

---

[4]Defendant includes two separate argument sections for Relator's claims under 31 U.S.C. § 3729(a)(1)(A) and (B).  Relator supports her claims under both subsections simultaneously, as courts evaluating PPP loan fraud claims under the FCA have held that the "elements of the first claim under 31 U.S.C. § 3729(a)(1)(A) . . . are the same for Relator's second claim under 31 U.S.C. § 3729(a)(1)(B)." *United States ex rel. Miller v. Manpow, LLC*, 2022 WL 18397530, at *7 (C.D. Cal. Sept. 14, 2022).  Indeed, Defendant presents no unique arguments in its Argument Section II addressing Relator's § 3729(a)(1)(B) claim.  MOL, at 18.

I.      **The FAC sufficiently alleges that ESI falsified its employee count on its PPP loan application.**

Defendant concedes revenue-based size exceptions allowing businesses with more than 500 employees to be eligible for a PPP loan do not apply to ESI.  MOL, at 10 n.7.  Thus, the only relevant inquiry is whether ESI was truly a "small business" with less than 500 employees, qualifying it to receive a PPP loan.  Relator alleges ESI took calculated actions to achieve an employee count below 500 right before the PPP took effect, thus manufacturing eligibility and ensuring the company would appear to meet SBA requirements on paper.  *See* FAC ¶¶ 12, 44, 45, 50, 59.  Specifically, Relator alleges ESI employed at least 500 employees since June 8, 2018, *id.* ¶¶ 52–57, and deceptively laid off 80 to 100 employees on March 27, 2020, solely to achieve a lower employee count before applying for a PPP loan.  *Id.* ¶ 44.

Defendant attempts three maneuvers to rehabilitate its actions.  First, Defendant suggests that manipulating its employee count by making unnecessary layoffs just before submitting a PPP loan application is irrelevant because the technicalities of the calculation process would not include the "effective" date of the layoffs.  *See* MOL, at 11.  Per SBA guidance regarding how to calculate employee count, the average employee count included in an April 2020 PPP loan application should largely reflect 2019 employment numbers.  Defendant crows that this dooms Relator's claim because the March 27 layoffs did not take effect until April 1, 2020.  FAC ¶ 44.  However, this argument entirely ignores Relator's multiple allegations that ESI employed 500 people since at least June 2018.  *Id.* ¶ 56.  At no point in 2019 did ESI list an employee count below 500 on its website, and CW3, who regularly verified ESI's employment count with the payroll department to fill out bid paperwork, stated that he/she had been listing employment numbers larger than 500 since at least 2018.  *Id.* ¶¶ 54–55, 57.  The far more plausible inference is that ESI's employee numbers had been steadily growing and, by late March 2020, the

10

company found itself needing to trim 80 to 100 people to make it seem even possible that its average employee count for the prior year had been less than 500. Had they not done so, they would have been forced to explain how a company with close to 600 employees in the first quarter of 2020 could have an average employee count of 490 for the previous twelve months or calendar year. Regardless, Relator directly alleges that ESI had at least 500 employees throughout 2019 and, therefore, was untruthful in its PPP loan application. *Id.* ¶¶ 54–57. Defendant's first argument fails.

Second, Defendant asserts that the employee counts listed in the FAC are irrelevant because the SBA uses a 12-month average employee figure. MOL, at 12. In claiming that Relator's allegations do not rise above a "speculative" level, *id.*, Defendant again ignores factual details well-pled in the FAC and asks the Court to disregard the applicable pleading standard and draw competing inferences in ESI's favor. The FAC alleges that ESI hit 500 employees on June 8, 2018. FAC ¶ 56. There is no indication that the company experienced a decline in employees after that date, or that its employee count fluctuated regularly. The FAC further alleges that ESI had 500 employees in February 2019, 500 employees in April, May, June, July, August, and October 2019, and 550 employees by August 2020. *Id.* ¶¶ 54–55. The plausible inference drawn in Relator's favor, as it must be at this stage, is that ESI had between 500 and 550 employees between June 2018 and August 2020. The average of those numbers is not 490. To assume that ESI used approximate numbers or had lower employee counts at various points of the relevant period is an inference that the Court simply cannot draw at this procedural stage. *See* MOL, at 12.

Even if the Court were to defer to Defendant's plea to use "common sense" in interpreting the employee counts listed on its website throughout 2019 as approximations, MOL

at 12–13, the additional allegations in the FAC compel an inference that ESI had at least 500 employees.  Specifically, CW3 stated that part of her job for ESI was to fill out bid paperwork, which often requested the bidding company's employee counts.  FAC ¶ 57.  CW 3 *verified ESI's employee numbers with the payroll department* before writing them on bid applications, and she confirmed that these numbers had been well over 500 since at least 2018.  *Id.* Such allegations are more than sufficient to support the inference that ESI lied about its employee count to be eligible to receive a PPP loan.  *See Manpow*, 2022 WL 18397530, at *5 (finding inconsistencies in numbers represented in PPP loan applications sufficient to support a scheme to submit false claims).  This false statement constitutes a violation of the FCA.  *See Nario*, 2022 WL 1241435, at *3.

Finally, Defendant argues the Court should disregard CW statements as to the pretextual nature of the March 27 layoffs because the timing of those layoffs did not affect the number of employees ESI reported on its PPP application.  MOL, at 14.  Defendant goes on to concede that the Court "must accept as true all of the allegations of the Confidential Witnesses included the allegation that that Confidential Witness (CW) 1 did not believe that the layoffs were necessary or justifiable (Am. Compl. ¶ 45); that CW2 heard from former colleagues that ESI began posting flyers for open positions soon after the layoffs (id. ¶ 48); and that CW1 recalled ESI holding a hiring event in April 2020 (id. ¶ 49)."  *Id.*  In addition to these allegations, which the Court must indeed accept as true, the Court must credit CW3's explanation that ESI had well over 500 employees beginning before and continuing through the SBA average employee count period.  FAC ¶ 57.  The Court further must accept as true that until March 27, 2020, ESI had 570 to 590 employees.  *See id.* ¶ 44 (explaining that ESI laid off approximately 80 to 100 employees to reach the 490-employee count level).  The numbers in these well-pled allegations simply do not

support Defendant's alternative self-serving theory that even if ESI had 500 employees during

some months in calendar year 2019 or March 2019 – March 2020 (which it did), it may still have

had so many fewer employees during other months that the average employee count was 490.

*Contra* MOL at 14 n.8.  The only inference plausibly drawn from the FAC is that ESI had at least

500 employees through this entire period, conducted a large-scale layoff to make a lower

employee count seem believable right before applying for a PPP loan, and lied both about its

employee count and its truth and accuracy to achieve PPP loan eligibility.  *See* FAC ¶¶ 23–24,

28, 44, 52–58.

**II.     The FAC sufficiently alleges that ESI falsely certified the economic necessity of the PPP loan.**

The employee count is not the only falsity on Defendant's PPP loan application: ESI also

falsely attested that the loan was "necessary" to support ongoing operations at the time it

submitted the PPP loan application in April 2020.  FAC ¶ 60.  Relator explains that loan

applicants filling out a BAF must initial next to various items to "certify in good faith" that, *inter

alia*, "[c]urrent economic uncertainty makes this loan request ***necessary to support the ongoing

operations of the Applicant***" and that the funds will be used only for enumerated qualified

purposes.  *Id.* ¶¶ 23, 28.  PPP loan applicants additionally had to certify that all the information

provided on and in conjunction with the BAF was true and accurate.  *Id.*  Though Defendant

suggests otherwise, *see* MOL at 14 n.9, 15, the Complaint plainly alleges that ESI could not have

honestly made these certifications.  *See* FAC ¶¶ 47 (alleging that ESI immediately began looking

for new employees after the March 2020 layoffs, demonstrating that there was no financial need

for those layoffs and that the company had so many projects it needed additional help); 52

(alleging that ESI self-reported revenue of $473 million for the year 2020, an amount higher than

2018, 2019, *and* 2021); 62 (alleging that CW4, a former Senior Staff Accountant at ESI, has

13

direct knowledge that ESI's financial status was "great" in 2020); 64–65 (alleging that CW1 and

CW2 both heard firsthand how ESI executives felt that "everything was great" in 2020 and did

not see any impact on ESI's contracts during the pandemic).  The FAC thus more than adequately

supports the inference that ESI did *not* need a PPP loan to "stay afloat" in 2020.

Defendant cites to *United States ex rel. Wilson v. Kellog Brown & Root, Inc.*, 525 F.3d

370, 376 (4th Cir. 2008), for the proposition that Relator must "plead facts that, ***if proven***, would

represent an objective falsehood."  MOL, at 14 (emphasis added).  Relator does not disagree with

this restatement of the pleading standard for FCA claims, and indeed, Relator has done exactly

what the Fourth Circuit required in *Wilson*.  The allegations here are unlike those dismissed in

*Wilson*, which the Fourth Circuit explained were breach of contract claims attempting to

masquerade as FCA claims.  *Wilson*, 525 F.3d at 373.  Relator's claims are far more similar to

the false statements found in actionable in *Harrison v. Westinghouse Savannah River Co.*, 176

F.3d 776 (4th Cir. 1999), where "the FCA relator claimed that the defendant made several

objectively misleading statements in an attempt to fraudulently induce the government to award

it a Department of Energy contract."  *Wilson*, 525. F.3d at 377.  As here, the defendant in

*Harrison* made untruthful statements in an attempt to receive funds from the Government, and

"such representations, if indeed untrue, constitute[] false statements under the FCA."  *Id.*

A.     **Relator alleges ESI had no economic need for a PPP loan at the time it applied.**

First, Defendant incorrectly contends that Relator makes no allegations as to ESI's

economic status at the time it applied for a PPP Loan, instead relying on ESI's financial success

both before and after April 2020.  MOL, at 15.  This is objectively untrue.  The FAC alleges that

at the 2020 "State of the Company" meeting, which occurred only weeks before ESI applied for

a PPP loan, ESI executives stated that they were the "biggest construction company in the

14

valley," that "everything was great," and that they had a backlog of projects to complete.  FAC ¶¶ 64–65.  ESI was not affected when the governor of Idaho issued a stay-at-home order, as construction had been deemed an essential business and ESI employees were directed to continue work and travel.  *Id.* ¶ 43.  Despite laying off 80 to 100 employees on March 27, 2020, ESI emailed remaining staff that same day stating its "jobsites never closed!" and immediately began posting about job openings.  *Id.* ¶¶ 46–49.  Multiple confidential witnesses confirmed that ESI did not have to delay or cancel projects due to COVID-19.  *Id.* ¶¶ 64–65.  To the contrary, ESI had major projects ongoing during the pandemic and continued to win jobs, many of which were multi-million-dollar projects.  *Id.*  In 2020 alone, ESI reported $473 million in revenue and 297 in ***new*** contracts, both increases over its pre-pandemic figures.  *Id.* ¶ 53.  In fact, ESI was doing so well that it had to apply for a PPP loan through a different financial institution than its normal servicer, knowing it would never be approved by a bank familiar with its actual financial details.  *See id.* ¶¶ 50, 59; *see also United States v. Brooks*, 2022 WL 1812254, at *6 (E.D. Va. Jun. 1, 2022) (finding that the defendant's use of different SBA-approved lenders to apply for PPP loans contributed to establishing that defendant knowingly submitted false claims).

These allegations speak directly to ESI's financial wellbeing at the time it applied for a PPP loan and indicate it had no economic need for government funds earmarked for struggling businesses.

**B.      Allegations regarding ESI's business before and after the PPP loan application indicate ESI had no economic necessity for the loan.**

It also bears noting that the false statements and certifications made on ESI's PPP loan application do not exist in a vacuum.  Defendant cannot simply ignore any and all context of ESI's business before and after the singular moment in time that ESI applied for a PPP loan, especially because ESI continued to apply for—and receive—forgiveness for the loan, even

knowing it had no economic need for the funds.  *See* FAC ¶¶ 3, 59, 67.  Defendant's behavior and representations made in the months prior to and following the falsified PPP loan application are indeed relevant since they present a plausible (and, in fact, exceedingly likely) inference that Defendant's statements were false *at the time they were made*.  Common sense dictates that, if ESI had more than 500 employees and was in no financial hardship prior to the first week of April 2020, and had more than 500 employees and was in no financial hardship after the first week of April 2020, it is reasonable to infer that there was no substantial difference *during* that single week in between.  To argue otherwise amounts to nothing more than a transparent plea to suspend disbelief and ask the Court to discredit the knowledge of Relator and several firsthand witnesses (two of whom continued to be employed by ESI through the end of 2020 and into 2021).

Defendant argues that ESI's earnings for years before the pandemic are "of no moment" because they do not speak to the economic uncertainty in April 2020.  MOL, at 15.  But Relator pleads facts regarding ESI's financial success prior to the pandemic to demonstrate that ESI was an established, successful business.  *See* FAC ¶¶ 52–57, 61, 64–65.  This is essential context tending to prove that ESI would not have an economic need for a PPP loan before the pandemic. No economic need subsequently arose when Idaho issued a stay-at-home order, largely restricting economic activity in general, because ESI was an essential business and continued working on its substantial projects as scheduled.  *Id.* ¶¶ 43, 65.  Thus, reading the FAC as a whole and accounting for ESI's preexisting success and ability to continue working (as well as the strength of its existing contracts and ongoing business operations), it is clear that ESI was not honest when it certified it had an economic need for a PPP loan.

16

Another notable piece of context Defendant attacks is ESI's purchase of the Cessna525C aircraft, which Relator alleges occurred in November 2020. *See* MOL at 16–17. Critically, Defendant obscures the fact that the Cessna525C was previously owned and registered by two different owners before ESI purchased it,[5] and that the certification *for the aircraft* in 2019 could have been made by the prior owner. Notably, the FAA registry does not indicate that the certificate was issued *to ESI* as Defendant suggests—only that ESI is the current registered owner. *See* MOL at 16. The secondary source upon which Relator relies and which Defendant calls in to question, *id.* at 16 n.10, actually more finely breaks down the ownership history and states that ESI's registration was on November 3, 2020. *See* FAC ¶ 66 n.17. Defendant offers no explanation as to why, if ESI actually purchased the aircraft in July 2019, it would require a temporary certificate, nor what such certificate could mean. In any event, the inconsistencies in these sources and the parties' interpretations of the data presented renders this issue a factual dispute inappropriate for resolution on a motion to dismiss. *See Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 515 (E.D. Va. 2014) ("because a 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court 'must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'") (quoting *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012)); *Twombly*, 550 U.S. at 55 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.").

---

[5] *See* FlightAware, *N271ES*, https://www.flightaware.com/resources/registration/N271ES (last visited June 28, 2024) (listing the previous owners of the aircraft as Cirrus Design Corp. and E&S Enterprises, Inc.).

Furthermore, Defendant is keen to ignore the fact that, in applying for a PPP loan, it expressly certified that the funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  FAC ¶ 28.  More specifically, on ESI's actual BAF, it stated it would use its PPP loan proceeds for payroll expenses.  *Id.* ¶ 50.  ESI additionally certified that it would use the PPP loan funds only for the purpose (payroll expenses) specified in its application.  *Id.* ¶ 22.  Accordingly, contrary to Defendant's assertion that Relator does not identify a prohibition against using PPP funds for legitimate business purchases—even going the great lengths to assume buying a private jet qualifies as a "legitimate" business purchase—Relator alleges that ESI, because of its own certifications, was prohibited from using its PPP loan funds for anything but payroll expenses. Falsely certifying it would use the PPP loan for payroll expenses resulted in the submission of a false claim for payment to the Government.  *Nario*, 2022 WL 1241435, at *3 ("making a false or fraudulent statement to obtain a government-funded loan violates the FCA.").

Moreover, the application to receive the PPP loan requires a certification that the loan is *necessary* to maintain ongoing operations.  *See* FAC ¶ 23.  If ESI misappropriated funds and purchased an unnecessary luxury jet, it is obviously more than plausible to infer that the PPP loan was not necessary to sustain ESI's business.[6]  *See*, *e.g.*, FAC ¶ 35 n. 15 (collecting recent PPP fraud cases and settlement agreements, many of which feature misappropriation of funds); *United States v. ManPow LLC*, 2024 WL 305699, at *10 (C.D. Cal. Jan. 3, 2024) ("Additionally, though the SBA required borrowers to submit '[d]ocumentation verifying . . . eligible cash

---

[6]The use of PPP loan funds to pay in part for luxury items such a Lexus and a Cessna aircraft (among other things) has been deemed significant enough by the Government to bring criminal charges against PPP loan recipients.  *See USA v. Kimdambu*, 1:20-cr-00260 (E.D. Va. 2020); Press Release, Dep't of J., *Man Pleads Guilty to $2.5 Million Coronavirus Fraud* (Jan. 28, 2021), https://www.justice.gov/usao-edva/pr/man-pleads-guilty-25-million-coronavirus-fraud.

compensation . . . from the Covered Period' to secure loan forgiveness, this fact does not negate the explicit certifications the SBA required Defendant to make in its various loan and forgiveness applications, nor does it foreclose the possibility that certain borrowers could have covered their payroll costs during the relevant period via non-PPP means while unlawfully misappropriating their PPP proceeds for ineligible purposes.").

As to loan forgiveness, Defendant omits critical details regarding what was required of PPP loan applicants. *See* MOL, at 17. As part of the BAF it submitted, ESI certified its understanding that PPP loan forgiveness would only be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, with not more than 25% of the forgiveness amount going toward non-payroll costs. FAC ¶ 28. General business purchases, let alone private jet purchases, are not contemplated in the forgiveness scheme. As a Bankruptcy Court in the Northern District of Texas recently explained:

> The PPP Borrowers certified in their PPP Forgiveness Applications that the funds were used for payroll costs, business rent or lease payments, business utility payments, and business mortgage interest payments. Although these PPP funding uses would be permissible under the relevant statutes, paying off a litigation settlement is nowhere on the list of permissible uses for these loans. And a "redemption payment" to liquidate an equity interest—which is how the Plaintiff characterizes the Settlement Payments—is also notably missing from the statutorily permissible uses for PPP loans. It is also worth mentioning that no PPP Borrower selected "other" as a potential use for the funds on the PPP Loan Applications, thereby limiting the fund usage to payroll, lease/mortgage interest, and utilities—and no other purpose.

*Fresh Acquisitions*, 2024 WL 2232432, at *34. ESI similarly stated on its BAF that it would use PPP loan funds for payroll expenses, thus limiting what it could use the proceeds for and the amount it could claim for forgiveness. FAC ¶ 22.

In sum, the Complaint more than sufficiently alleges that ESI submitted false statements and certifications to the Government in order to fraudulently obtain and misappropriate PPP loan

19

funding.  *See United States ex rel. Berkley v. Ocean State, LLC*, 2023 WL 3203641, at *7 (D.R.I.

May 2, 2023) (finding a complaint alleging the defendants "prepared and submitted or caused to

be submitted to the SBA loan applications containing false information" sufficiently stated a

claim under 31 U.S.C. § 3729(a)(1)(B)).  There is no basis for the Court to dismiss the

Complaint for failure to establish false claims in violation of § 3729(a)(1)(A), § 3729(a)(1)(B),

and § 3729(a)(1)(G).

### III.    The FAC sufficient alleges that ESI fraudulently avoided an obligation to pay the Government.

In addition to its meritless attacks against Relator's factual allegations establishing that

ESI submitted false claims, Defendant also dismisses the careful nuance of the "reverse false

claims" alleged in the Complaint under 31 § 3729(A)(1)(G).  As alleged in Count III,

Defendant's fraudulent actions in not only failing to repay the PPP loan but, in fact, requesting

forgiveness for the loan, were independent of and additional to its fraudulent conduct in

obtaining the PPP loans in the first place.  FAC ¶ 84.  Defendant's authorities to the contrary are

inapposite, as neither of the proffered cases address a fraudulent loan application and separate

fraudulent request for loan forgiveness.  *See United States ex rel. Branscome v. Blue Ridge Home

Health Servs., Inc.*, 2018 WL 1309734, at *5 (W.D. Va. Mar. 13, 2018) (alleging reverse false

claims based on fraudulent submissions to Medicare, which would ordinarily warrant repaying

the Government for those claims); *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 97

(D.D.C. 2014) (addressing allegations that misappropriation of grant funding, which did not

trigger a specific obligation to repay).

In contrast, Relator alleges two connected but distinct components of Defendant's

fraudulent conduct.  First, ESI made false statements and certifications in support of its loan

application, knowing full well that its loan request would not be approved otherwise, which

forms the basis of Counts I and II.  Second, ESI made false certifications in support of its loan *forgiveness* request, after having misappropriated the already fraudulently obtained loan funding, which forms the basis of Count III.  *See* FAC ¶¶ 3,59, 67, 69.  Thus, there is no basis to dismiss Count III for failure to allege fraudulent conduct independent of falsifying the loan applications. *See Brooks*, 2022 WL 1812254, at *5–6 (finding FCA liability for false statements made in loan applications *and* separate false statements made in loan forgiveness applications); *Berkley*, 2023 WL 3203641, at *7 (holding allegations that defendants knew "they were not entitled to the PPP loans" and thus "knowingly retained an overpayment" sufficient to state a claim under 31 U.S.C. § 3729(a)(1)(G)).

## **CONCLUSION**

For the foregoing reasons, Relator respectfully requests that the Court deny Defendant's Motion.

Dated:  July 1, 2024                                  Respectfully submitted,

                                                      /s/ Patricia D. Ryan
                                                      Patricia D. Ryan
                                                      Virginia Bar No. 35945 (EDVA – Admitted)
                                                      6106 Harvard Ave., PO Box 633
                                                      Glen Echo, Maryland 20812
                                                      Email: patriciaryan@pdrlaw.com
                                                      Telephone: (240) 481-6284

                                                      James E. Miller
                                                      Miller Shah LLP
                                                      65 Main Street
                                                      Chester, CT 06412
                                                      Telephone: (866) 540-5505
                                                      Facsimile: (866) 300-7367
                                                      jemiller@millershah.com
                                                      *Admitted Pro Hac Vice*

                                                      Bruce D. Parke
                                                      Miller Shah LLP
                                                      1845 Walnut Street, Suite 806
                                                      Philadelphia, PA 19103
                                                      Telephone: (866) 540-5505
                                                      Facsimile: (866) 300-7367
                                                      bdparke@millershah.com
                                                      *Admitted Pro Hac Vice*

                                                      Rachel V. Rose – Attorney at Law, PPLC
                                                      P.O. Box 22718
                                                      Houston, Texas 77227
                                                      Email: rvrose@rvrose.com
                                                      Telephone: (713) 907-7442
                                                      *Admitted Pro Hac Vice*

                                                      ***Attorneys for Relator***

22

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2024, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send electronic filing to all counsel of record.

*/s/ Patricia D. Ryan*
Patricia D. Ryan

23