IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES *ex rel.* KAREN BLOOMFIELD, <br><br>　　　　Relator/Plaintiff, <br><br>　　v. <br><br>ENGINEERED STRUCTURES, INC., <br><br>　　　　Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:22-cv-00789-DJN-IDD <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT ENGINEERED STRUCTURES, INC.'S
<u>REPLY IN SUPPORT OF ITS MOTION TO DISMISS RELATOR'S AMENDED
COMPLAINT</u>**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Civil Rule 7, Defendant Engineered Structures, Inc. ("ESI" or the "Company") respectfully submits this Reply in support of its Motion to Dismiss the Amended Complaint, ECF No. 41 (the "Motion to Dismiss") and Memorandum of Law in Support of the Motion to Dismiss, ECF No. 41-1 ("Memorandum" or "Mem.").

<u>**ARGUMENT**</u>

**I.  THE OPPOSITION UNDERSCORES THE INFIRMITIES OF THE AMENDED COMPLAINT**

Relator's Memorandum in Opposition to ESI's Motion to Dismiss, ECF No. 42 (the "Opposition" or "Opp.") only highlights the lack of plausible and particularized facts in the Amended Complaint. Backpedaling on the linchpin allegations about the purported reason for the ESI layoffs and the timing of the aircraft purchase, the Opposition now asks the Court to look to the general "context of ESI's business" (Opp. at 15) and draw the inference that statements on

ESI's loan application must have been false. As set forth below, allegations of fraud should not be allowed to proceed on such a thin reid.[1]

### a. The Opposition Backtracks on the Alleged Reason for the ESI Layoffs

In the Amended Complaint, Relator alleges that ESI laid off 80-100 employees so that the Company could list fewer than 500 employees on its PPP application. First Amended Complaint ¶ 50, ECF No. 39 ("Am. Compl.") ("[T]he company laid off approximately 100 employees just before April 1, 2020 *in order to claim* that it only employed 490 workers and, therefore, *met the threshold requirement for SBA PPP Loan approval* . . . .") (emphasis added). Faced with the SBA Guidance at FAQ #14 that makes clear that the April l, 2020 layoffs would have no impact on the headcount calculation for the PPP application, the Opposition attempts to walk back the allegation that Relator made in the Amended Complaint. Rather than terminating employees in order to "claim" 490 employees on the loan application, Relator now argues that ESI made these layoffs because the Company "found itself needing to trim 80 to 100 people to *make it seem even possible* that its average employee count for the prior year had been less than 500" (Opp. at 11) (emphasis added) and to "make a lower employee count *seem believable* . . . ." *Id.* at 13 (emphasis added).

But even this watered-down version of the allegation does not stand to reason. If ESI was ever "forced to explain" how it had arrived at the headcount of 490 employee (Opp. at 11), the explanation would be made to the SBA, which would use the period of measurements set forth in the SBA Guidance at FAQ #14. Mem. at 3-4. Under this guidance, the April 1, 2020 layoffs would have no impact on the number of employees listed on a PPP loan application that was

---

[1] To avoid rehashing reasons for dismissal, this reply addresses arguments from the Opposition that were not previously addressed by ESI's opening brief. ESI otherwise rests on the arguments in its Memorandum. ECF No. 41-1.

submitted that same month. Mem. at 11-12. The average headcount during the period of measurement was either above the 500-employee threshold or it was not, and terminations made outside the period of measurement would not make the 490-employee figure any more "possible" or "believable" to the SBA. By backtracking on the alleged reason for the layoffs, the Opposition undermines the central allegation of the Amended Complaint that ESI was "manipulating its workforce numbers and accounting to secure funds from the SBA's PPP." Am. Compl. ¶ 12.

The Opposition also draws further attention to Relator's misapplication of the SBA's method for calculating headcount. The SBA Guidance in FAQ #14 sets forth two acceptable methods for determining the headcount on PPP loan applicants submitted in April 2020: (1) the *average* employee count for each of the pay periods in calendar year 2019; or (2) the *average* employee count for the 12 completed calendar months prior to the date of the loan application—*i.e.*, March 2019 through March 2020. Mem. 3-4. Relator cites to the SBA Guidance in FAQ #14 in the Amended Complaint, but then fails to follow this guidance when making allegations about dates that fall well outside either period of measurement. Opp. at 11 ("ESI hit 500 employees on June 8, 2018.").

### b. The Opposition Further Highlights Relator's Misinterpretation of the ESI Webpage Archives

The Opposition argues that "[a]t no point in 2019 did ESI list an employee count below 500 on its website" (Opp. at 10), but as noted in ESI's opening brief (Mem. at 12-13), Relator's allegation about the information on ESI's website incorrectly assumes that the various metrics on the "Who We Are" webpage such as the number of employees, "cubic yards of concrete poured," and "tons of steel hung" are actuals rather than mere approximations. Furthermore, the Opposition assumes without reason that the information on the Who We Are page is regularly updated such that the employee count on the page accurately reflects the number of employees working for ESI

3

on the dates the website was archived. But a review of the webpage archives on the 2019 and 2020 dates referenced in Table C of the Amended Complaint (Am. Compl. ¶ 54) does not support Relator's interpretation.[2] Rather, a review of the webpage on the archived dates shows that most of the content on the webpage remained unchanged on the days that it was archived in 2019.

To infer from the archives that ESI had 500 employees on April 19, 2019 and October 14, 2019 simply because the website remained the same, would mean that the Court would also have to infer that the Company had not poured a single yard of concrete or hung any steel over the course of six months because those metrics also remained unchanged on the website when it was archived on April 19, 2019 and October 14, 2019. In sum, the more plausible and common-sense interpretation of the archived information is that the metrics were not updated frequently enough to be a proxy for the actual number of employees working at ESI on a given date.

Even if the Court were to accept the Opposition's invitation to treat the metrics on the ESI webpage as actuals, this would still not support Relator's theory that the 490 employees listed on the PPP loan application was false. The Opposition writes that "[t]here is no indication that the company experienced a decline in employees after [June 8, 2018]" that would lower the average employee count within the period of measurement (Opp. at 11), but in making this argument, the Opposition ignores the very same archived information that Relator included in Table C. Notably, Table C only includes the employee count for only nine out of the 365 days that constitute a period of measurement. Yet even within this small sample, Table C shows a *decline* between the number of employees listed on February 18, 2019 and the number of employees listed on April 19, 2019.

---

[2] Internet archives showing the Who We Are webpage on the 2019 and 2020 dates referenced in Table C can be found here:
https://web.archive.org/web/20190218015853/https://esiconstruction.com/who-we-are/. The Court can consider the archived versions of the webpage because the archives are integral to and explicitly relied on in the Amended Complaint.

Am. Compl. ¶ 54.  In other words, even if the Court were to treat the employee information on the ESI website as actuals, the Court would not have to assume any facts outside the four corners of the Amended Complaint to infer that ESI's headcount *declined* at points within the period of measurement, and that decreases in headcount on any of the 356 days not included in Table C could result in the average of 490 employees that ESI listed on its application.

### c. Relator's Own Allegations Undermine the Argument that ESI's Economic Necessity Certification was False

The Amended Complaint's allegation about ESI's purchase of a Cessna aircraft is central to Relator's theory that the Company did not need a PPP loan, which is why the Opposition tries (but ultimately fails) to salvage this linchpin allegation.

In the Amended Complaint, Relator alleges that after receiving a PPP loan, ESI improperly used "the funds during the loan period to purchase the Cessna525C."  Am. Compl. ¶ 67.  In its memorandum (Mem. at 16-17), ESI pointed out that the FAA aircraft registry for the Cessna525C states that the initial registration certificate for the aircraft was issued to ESI on July 16, 2019, well before the receipt of PPP funds.  ESI also cited to the relevant FAA regulations which state that registration can only occur <u>after</u> ownership has been established.  *See* 14 C.F.R. § 47.39 (certificate of registration issued on the date that all requirements are met including the submission of evidence of ownership).

In response, the Opposition argues that "Defendant obscures the fact that the Cessna525C was previously owned and registered by two different owners before ESI purchased it, and that the certification *for the aircraft* in 2019 could have been made by the prior owner."  Opp. at 17 (footnote omitted).  The Opposition identifies the previous owners of the aircraft as E&S

5

Enterprises, Inc. and Cirrus Design Corp. *Id.* at 17 n.5.[3] But once again, Relator misreads the information on the Flight Aware website and the FAA Registry—both of which are integral to and explicitly relied on in the Amended Complaint. Am. Compl. ¶ 66, n.17.

Both websites cited by the Relator list information for two <u>different</u> aircraft associated with registration number N271ES. One aircraft is the 2012 Cessna525C with serial number 525C0091 that is referenced in the Amended Complaint (Am. Compl. ¶ 66) and was registered to ESI on July 16, 2019. ECF No. 41-2 at 26. The other aircraft was a 2007 plane manufactured by Cirrus Design Corp. (model SR22) with serial number 2513 that was registered to E&S Enterprises, Inc. before the Cirrus SR22 aircraft was ultimately deregistered in April 21, 2017. *Id.* at 27.

Eliminating any uncertainty that these are two different aircraft, the Flight Aware website that is referenced in the Amended Complaint includes photos of the two aircraft that have been associated with registration number N271ES. One photo is of the Cessna that was registered to ESI on July, 16, 2019. The other photo is of the single-engine SR22 that was registered to E&S Enterprises before the aircraft was deregistered in 2017.[4]

---

[3] The Opposition argues that ESI "offers no explanation as to why, if ESI actually purchased the aircraft in July 2019, it would require a temporary certificate, nor what such certificate could mean." Opp. at 17. At the pleading stage, ESI cannot introduce new facts that are not in the Amended Complaint, and so ESI is unable to describe the specific circumstances of the temporary certificate. However, according to the FAA regulations, a temporary certificate can be issued for a number of reasons. For example, FAA regulation 14 C.F.R. § 47.49 states that a registered owner can request a replacement certificate of registration if the original is lost, stolen, or mutilated, and that as part of this process the registered owner can request a temporary certificate pending receipt of the replacement.

[4] Based on the condition of the Cirrus SR22 in the photo, the Court can draw a reasonable inference that the Cirrus SR22 was deregistered because it was no longer airworthy.




**Cessna525C**  **Cirrus SR22**

As the Opposition notes, the Court must accept as true all of the factual allegations in the Amended Complaint, including the attachments incorporated by reference. Opp. at 16. But the Court does not have to follow the Opposition's clear misreading of the information on the FAA Registry and Flight Aware websites. The only plausible reading of the registration information is that the Cessna525C was registered to ESI on July, 16, 2019, long before it applied for a PPP loan.

The purported purchase of the Cessna with PPP funds is central to the Amended Complaint's allegation that ESI made a false certification that the PPP loan was necessary to support the Company's ongoing operations. Opp. at 18 ("If ESI misappropriated funds and purchased an unnecessary luxury jet, it is obviously more than plausible to infer that the PPP loan was not necessary to sustain ESI's business."). But without the Cessna allegation, Relator's false certification theory as to the economic necessity certification rests largely on publicly-available financial information and statements from confidential witnesses about the state of the Company before and after the PPP loan application. *Id.* at 4. But these broad-brush allegations lack the plausible and particularized facts needed to show that ESI's good faith certification was objectively false when the Company certified in early April 2020 that "[t]he current economic uncertainty makes this loan necessary to support the ongoing operations of the applicant." Am. Compl. ¶ 60. Indeed, the allegation that ESI laid off a sizable segment of its workforce shortly before it applied

for the loan because the COVID-19 pandemic had "impacted ESI's business significantly," weighs heavily in favor of an inference that ESI made the economic necessity certification in good faith. ECF No. 41-2 at 23.

Lastly, the fact pattern described by the confidential witnesses in the Amended Complaint is undoubtedly similar to the experience of thousands of other small businesses that applied for PPP loans—*i.e.*, financial prospects were strong in January and February; there was economic uncertainty in March and April; and in the months following receipt of the PPP loans, the business not only survived but thrived. The fact that the bottom did not fall out for ESI and other businesses in late 2020 or 2021 does not mean that their good faith certification about economic necessity at the start of the pandemic was false. To rule otherwise, would open the door to potential FCA liability for the many small businesses that received PPP loans. For all of the reasons set forth here and in ESI's opening brief, Count I must be dismissed.

## II. THE § 3729(a)(1)(B) CAUSE OF ACTION (COUNT II) FAILS TO STATE A CLAIM FOR THE SAME REASONS THAT COUNT I SHOULD BE DISMISSED

The Opposition mischaracterizes Section II of ESI's Memorandum and argues that the Company presented "no unique arguments" as to why the false statement cause of action should be dismissed (Opp. at 9, n.4). But the Opposition ignores ESI's argument (Mem. at 18) that pleading a viable cause of action under the false statement provision at § 3729(a)(1)(B) is contingent upon Relator adequately pleading a false claim for payment. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). In other words, where a relator fails to plead a false claim for payment (as is the case here), the § 3729(a)(1)(A) and § 3729(a)(1)(B) causes of action must both be dismissed. *Id.* ("The complaint thus fails to state a claim under § 3729(a)(1)(B) for essentially the same reasons as under § 3729(a)(1)(A).").

### III. THE AMENDED COMPLAINT IS DEVOID OF ANY PARTICULARIZED FACTS ABOUT A FALSE RECORD OR STATEMENT MATERIAL TO AN OBLIGATION TO RETURN PPP FUNDS

As set forth in ESI's Memorandum, in order for the reverse false claim cause of action at Count III to survive dismissal, Relator must plead the prima facie elements of § 3729(a)(1)(G). Among the elements that must be pled with particularity are a "false record or statement" that is material to an "obligation", which the statute defines as "an *established duty*, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." § 3729(b)(3) (emphasis added). Here, Relator has not alleged a specific false record or statement that ESI made in connection with its loan forgiveness application, nor does the Amended Complaint identify the source of any established duty that would have obligated ESI to return the PPP funds.

The Opposition argues that the reverse false claim cause of action should survive dismissal because "ESI made false certifications in support of its loan *forgiveness* request, after having misappropriated the already fraudulently obtained loan funding, which forms the basis of Count III." Opp. at 21. The Opposition cites paragraphs 3, 59, 67, and 69 of the Amended Complaint for this proposition, but none of these paragraphs discuss any certifications that ESI made in the loan forgiveness application, much less explain how ESI's certifications were false and material to an obligation to return the PPP funds.

In discussing ESI's alleged misappropriation of PPP funds, the Opposition mischaracterizes ESI's argument from the opening brief and suggests that the Company used PPP funds to pay for business costs that were not eligible for forgiveness. Opp. at 18. But that distorts the Company's argument, which simply states that PPP borrowers were granted forgiveness so

long as borrowers "could show that the dollar amount for which forgiveness was requested was used to pay business costs that are eligible for forgiveness (*e.g.*, payroll costs, lease payments)." Mem. at 17.  For example, if a borrower received an $8 million PPP loan, that borrower could seek forgiveness of the loan so long as the borrower could show that it had spent $8 million on payroll during the covered period.  In this example, the forgiveness decision would be based on whether the borrower could produce the necessary documentation listed in the Form 3508 (ECF No. 41-2 at 20) to show that the borrower had in fact paid these payroll costs during the covered period.  If so, forgiveness would be granted, and the fact that this borrower may have made other business purchases during the covered period (*e.g.*, new office furniture) would not mean that the borrower had somehow misappropriated PPP funds.

The facts as alleged in this case can be easily distinguished from the criminal action cited by the Opposition.  In that matter, the borrower did not pay any eligible business costs, but he created fraudulent payroll documentation to make it appear as though he had so that he could misappropriate the funds.  Opp. at 18, n.6.  Here, there is no allegation that ESI did not actually have payroll costs for 490 employees when it sought forgiveness.  Nor is there any allegation that ESI submitted false supporting documents when it sought forgiveness of the loan.  Without these sorts of allegations, there is no support for the Opposition's argument that ESI somehow misappropriated funds that the Company was obligated to return.

The cases cited by the Opposition also miss the mark.  The *Brooks* decision (Opp. at 21) references false statements made in a defendant's PPP loan forgiveness applications, but the Department of Justice—which filed the case in *Brooks*—tellingly did not even include a reverse false claim cause of action in the complaint.  *United States v. Brooks*, No. 22-cv-0101, 2022 WL 1812254 (E.D. Va. Jun. 1, 2022).  The *Berkley* case (Opp. at 21) is also inapposite.  *United States*

*ex rel. Berkley v. Ocean State, LLC*, No. 20-538, 2023 WL 3203641 (D.R.I. May 2, 2023). That case included detailed allegations that defendants were not eligible for the PPP loan because of the SBA's affiliation rule (which calculates the number of employees by considering the headcount of both the company and any affiliated entities). Unlike the unfounded misappropriation allegations here, the affiliation allegations in *Berkley* could potentially result in a false statement on the SBA Loan Forgiveness Application Form 3508 because the form required that the applicant list the number of employees at the time of the initial loan application and the forgiveness application. ECF No. 41-2 at 9.[5] Here, the Amended Complaint lacks any particularized allegations about any certifications or statements on ESI's Form 3508 that were purportedly false. Nor does the Amended Complaint identify the source of any "established duty" to return the PPP funds that ESI purportedly avoided. For these reasons, Count III must be dismissed.

## CONCLUSION

For these reasons and those stated in ESI's motion to dismiss and memorandum in support, ESI respectfully requests that the Court grant its motion to dismiss and dismiss the Amended Complaint with prejudice.

---

[5] For the same reasons set forth above in section II, the Amended Complaint fails to adequately plead that ESI's listing of 490 employees on the Form 3508 would be false.

11

Dated: July 8, 2024	Respectfully Submitted,

*/s/ Jason M. Crawford*
Jason M. Crawford, VA Bar No. 83781
Amy Laderberg O'Sullivan, VA Bar No. 44267
Agustin D. Orozco (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
JCrawford@crowell.com
AOSullivan@crowell.com
AOrozco@crowell.com

*Counsel for Defendant Engineered Structures, Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 8th day of July 2024, I electronically filed the foregoing using the Court's NextGen CM/ECF system, which caused service on all counsel of record.

      */s/ Jason M. Crawford*
Jason M. Crawford, VA Bar No. 83781
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
JCrawford@crowell.com

*Counsel for Engineered Structures, Inc.*