IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

KAREN BLOOMFIELD,
    Plaintiff-Relator,

v.                                 Civil No. 1:22cv789 (DJN)

ENGINEERED STRUCTURES, INC.,
    Defendant.

## MEMORANDUM ORDER
### (Granting in Part and Denying in Part Plaintiff-Relator's *Daubert* Motion; Granting in Part and Denying in Part Defendant's *Daubert* Motion)

This matter comes before the Court on both parties' *Daubert* motions: (1) Defendant Engineered Structures, Inc.'s ("Defendant") Motion to Exclude or Limit the Expert Testimony of Andrew S. Adams (ECF No. 73 ("Adams Motion")); and (2) Plaintiff-Relator Karen Bloomfield's ("Relator") Motion to Exclude the Opinion and Testimony of Kathryn Frost (ECF No. 76 ("Frost Motion")). For the reasons set forth below, the Court hereby GRANTS IN PART and DENIES IN PART the Adams Motion (ECF No. 73) and GRANTS IN PART and DENIES IN PART the Frost Motion (ECF No. 76).

## I.    BACKGROUND

The Court assumes the reader's familiarity with the underlying proceedings. As the facts of this case have been related elsewhere, (*see* ECF No. 46), this Order recounts only those facts necessary to resolve the instant Motions.

In this False Claims Act ("FCA") case, Relator accuses Defendant, her former employer, of "knowing and reckless submission of false and fraudulent claims in connection with the

Paycheck Protection Program ("PPP")."[1]  (ECF No. 39 ("First Amended Complaint" or "FAC") at 1.)[2]  The PPP arose out of the March 2020 Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281, which created a system of forgivable loans to small businesses that aimed to enable employers to keep employees on the payroll, rather than lay them off.[3]  (*Id.* ¶ 1.)  Businesses seeking a PPP loan had to fall below specific headcount numbers at the time of application and had to certify in good faith "that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient."  15 U.S.C. § 636(a)(36)(D)(i), (a)(36)(G)(i)(I) (the "Economic Necessity Certification").  Section 1106 of the CARES Act permits businesses with PPP loans to apply for loan forgiveness "equal to the sum of" payroll, mortgage interest, rent and utility expenses paid during the period of the loan.  CARES Act § 1106(b), 134 Stat. at 298 (codified as amended at 15 U.S.C. § 636m(b)).[4]  The PPP constituted an addition to the Small Business Act, 15 U.S.C. § 636, which confers upon the Small Business Administration (the "SBA") the responsibility for administering authorized loan programs, including the PPP.  15 U.S.C. § 636(a).  The SBA ended the PPP on May 31, 2021.  *Paycheck Protection Program*, U.S. SMALL BUS. ADMIN.,

---

[1]    The United States of America (the "Government") elected not to intervene in this case pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(B).  (ECF No. 17 at 1.)  Relator maintains this action in the name of the Government pursuant to Section 3730(b)(1) of the FCA.

[2]    The Court employs the pagination assigned to the parties' various filings by the CM/ECF system.

[3]    Congress titled Title I of Division A of the CARES Act "Keeping American Workers Paid and Employed."  Pub. L. No. 116-136, 134 Stat. 281.

[4]    If a business cut its workforce or reduced its employees' salaries or wages, the amount of forgiveness would be proportionally reduced.  CARES Act § 1106(d), 134 Stat. at 298–99 (codified as amended at 15 U.S.C. § 636m(d)(2)–(3)).

https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last visited August 18, 2025) [https://perma.cc/U2AN-KLVF].

In April 2020, shortly after the SBA began accepting applications, Defendant applied for and received a PPP loan of approximately $8.6 million. (ECF No. 50 ¶ 50; FAC ¶ 50.)  Relator centrally alleges that, during the application process, Defendant falsely certified that (1) it fell within the PPP's size limits for businesses and (2) its PPP loan request was necessary to support its ongoing operations due to the uncertainty of then-current economic conditions. (FAC ¶¶ 50, 60.)  Defendant subsequently applied for and received loan forgiveness in June 2021. (*Id.* ¶ 67.)

Following Relator's filing of her First Amended Complaint, Defendants filed a motion to dismiss, seeking dismissal primarily on four grounds: (1) failure to sufficiently allege that the reported employee count on Defendant's PPP loan application proved false; (2) failure to show that Defendant's economic necessity certification constituted an objective falsity; (3) failure to allege a false claim in Count II of the FAC; and (4) failure to allege conduct in Count III that could be distinguished from the conduct alleged in Counts I and II. (ECF No. 36 at 13–20.)  The Court found these arguments to lack merit and denied the motion in full. (ECF Nos. 46–47.)

In the course of this litigation, Relator retained forensic accountant Andrew S. Adams as an expert in this matter. (ECF No. 78-6 ("Adams Report") ¶¶ 4–5.)  Mr. Adams's expert report includes opinions on the number of employees that Defendant employed for purposes of its eligibility under the PPP, as well as Defendant's financial and business condition at the time of its PPP application. (*Id.* ¶ 3.)  Mr. Adams also opines on the amount of damages allegedly incurred by the Government as a result of Defendant's actions. (*Id.*)  Defendant, in turn, retained Kathryn Frost, former Associate Administrator for the SBA's Office of Capital Access, to opine

on the PPP. (ECF No. 78-7 ("Frost Report")) ¶ 1.) [5] Ms. Frost's report strives to explain events impacting the creation of the PPP and its purpose as envisioned by Congress, as well as the program's structure and implementation. (*Id.* ¶ 12.) She also seeks to provide context for the decision-making processes that small businesses faced during the early days of the COVID-19 pandemic and the effects of the pandemic on these businesses. (*Id.*)

Each party now moves the Court to exclude the opposing side's expert's testimony in full.[6] (ECF Nos. 73, 76.) These motions have been fully briefed, (ECF Nos. 74, 77, 80, 82, 88, 89), rendering them ripe for the Court's review.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" all of the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[5]    During discovery, Ms. Frost provided Relator with amended versions of her report, in which she corrected errors and streamlined citations. (Frost Report ¶ 7; ECF No. 78-8 ("Frost Supp. Report") ¶ 1.) The Court will consider the amended versions of Ms. Frost's report as the relevant documents for purposes of Relator's *Daubert* motion.

[6]    Defendant also retained Lizette Martinez, a forensic accountant, who produced a report including financial, accounting and economic analysis related to this litigation. (ECF No. 75-3.) Relator did not file a motion to exclude Ms. Martinez's proposed testimony. The Court therefore does not engage further with Ms. Martinez's opinions at this time.

Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). In undertaking this gatekeeping function, district courts enjoy "broad latitude to consider . . . the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rule 702 inquiry thus necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that the expert draws. *Id.*

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Courts look to several factors as indicia of reliability, including "testing, peer review, evaluation of rates of error, and general acceptability" in the expert's field. *Id.* For an expert to satisfy a court's reliability inquiry, the court must find that "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–593. The Fourth Circuit recently reiterated that, while an expert "need not be precisely informed about all details of the issue . . . he must have satisfactory knowledge, skill, experience, training [or] education on the issue for which the opinion is proffered." *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 254 (4th Cir. 2025) (quotation omitted).

Regarding relevance, district courts must ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. The relevance inquiry is one of "fit" — expert testimony

must demonstrate "a valid . . . connection to the pertinent inquiry as a precondition" to admissibility. *Id.* at 591–92.

Throughout its Rule 702 analysis, a district court must remain cognizant of two bedrock, yet competing, principles. On the one hand, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry*, 178 F.3d at 261. District courts therefore "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Id.* On the other hand, expert testimony often proves uniquely capable of confusing or misleading the jury. *Id.* "[P]roffered evidence that has a greater potential to mislead than to enlighten" should therefore be excluded. *Id.* Critically, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

The Fourth Circuit has consistently emphasized that Rule 702's "touchstone . . . is whether the testimony will assist the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *see also United States v. Sanders*, 107 F.4th 234, 258 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1434 (2025) ("To be admissible, Rule 702 of the Federal Rules of Evidence requires that the expert's testimony 'will help the trier of fact.'") (citing Fed. R. Evid. 702(a)). Expert testimony "that merely states a legal conclusion as to the meaning or application of a rule or statute is not 'helpful,' as required by Rule 702," and is therefore generally inadmissible. *United States v. Cortez*, 205 F. Supp. 3d 768, 776 (E.D. Va. 2016); *see also United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (noting that an expert opinion is "generally inadmissible" if it "states a legal standard or draws a legal conclusion by applying law to the facts") (citation omitted). That is because "an expert telling a judge how to interpret a rule or statute does nothing more than

6

give an attorney a redundant means of presenting legal argument to the Court." *Cortez*, 205 F. Supp. at 776; *see also Brainchild*, 144 F.4th at 253 (noting that "there is already a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law." (quotation omitted).)

Trial courts enjoy broad discretion when ruling on *Daubert* motions. *See United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) ("[A] trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony.") In many instances, vigorous cross-examination at trial provides the more suitable remedy for a party seeking to exclude an opposing expert's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## III.    DISCUSSION

### A.    Adams Motion

Mr. Adams's expert report proffers opinions in three categories:  (1) the number of persons employed by Defendant for purposes of its PPP application; (2) Defendant's financial and business condition at the time of its PPP application, wherein Defendant certified that "[c]urrent economic uncertainty makes this loan request necessary to support . . . ongoing operations," 85 Fed. Reg. 20811, 20814 (Apr. 15, 2020); and (3) the amount of damages incurred by the Government as a result of Defendant's actions, should liability be established.  (Adams Report    ¶ 1.)  In support of his qualification to opine on these matters, Mr. Adams cites his

7

background in accounting, including bachelor's and master's degrees in that discipline, as well as

his certifications as a Certified Public Accountant ("CPA") and Certified Fraud Examiner

("CFE") and his certification in financial forensics ("CFF"). (*Id.* ¶ 4.) He also has two decades

of experience with public and private sector clients, and has provided services related to forensic

accounting, complex financial fraud, accounting malpractice, and anti-fraud waste and abuse,

among other areas. (*Id.* ¶ 5.) Adams specifically highlights his "experience with government-

sponsored economic assistance programs." (*Id.*) As he described during his deposition, Adams

has also acquired experience with matters related to the CARES Act, including the PPP. (ECF

No. 83-4 at 3:2–4:1, 4:13–5:11.) Mr. Adams's report does not mention any specific experience

examining financial or other documents related to the construction industry.

Defendant seeks to exclude all three categories of Mr. Adams's opinions, as well as his

rebuttal opinions concerning Defendant's proposed accounting expert, Ms. Lizette Martinez.

(ECF No. 74 ("Adams Memorandum of Law" or "Adams Mem.") at 12, 14.) The Court

addresses each category in turn.

### 1. Headcount Opinions

The Court begins with Mr. Adams's opinions about Defendant's 2019 average headcount,

which he presents in revised form in his supplemental report.[7] Mr. Adams centrally opines that

---

[7]    Defendant makes much of the fact that Mr. Adams's supplemental report arrives at a
different headcount number than his original report. As Mr. Adams explains, his revised figures
stem from Defendant's late production of documents that provided specifics concerning
Defendant's use of temporary employees during 2019. (ECF No. 78-5 ("Adams Supp. Report")
at 5–6.) Adding these temporary employees to the headcount calculations that Adams produced
in his original report unsurprisingly resulted in a higher overall figure. (*Id.*) Defendant's
relentless protestations that Adams "change[d] directions," (Adams Mem. at 5), "completely
reverses" himself, (*id.* at 11), "completely changed the direction of his analysis," (*id.* at 16), and
engaged in "an ever-morphing analysis," (ECF No. 88 ("Adams Reply") at 6), are overblown and
factually inaccurate. Defendant could have avoided the need for Mr. Adams's revisions by

the headcount numbers Defendant presented in its PPP application "did not include temporary

employees in its 2019 average employee headcount," and that factoring in these temporary

employees would result in a 2019 average headcount of 528. (ECF No. 78-5 ("Adams Supp.

Report") at 5–6, 18.) According to Adams, this figure — which exceeds the "500-employee

ceiling" for PPP loan eligibility — "would have precluded [Defendant] from qualifying for the

PPP Loan altogether," had it submitted that figure to the SBA. (*Id.* at 5–6.) Adams bases these

opinions on his assessment of SBA guidance and regulations, including 13 C.F.R. § 121.106,

which sets forth the way that SBA calculates "a concern's number of employees," and which

Adams deems applicable here. (*Id.* at 6); 13 C.F.R. § 121.106(a). His calculations, meanwhile,

stem from a host of documents provided by Defendant, including Defendant's accounts payable,

a report by one of the temporary staffing agencies that Defendant confirmed it used in 2019 and

2020, Defendant's own calculations, payroll registers, and Payroll Employee Sequence Detail

Reports. (Adams Report ¶¶ 38–41; Adams Supp. Report at 5–7.) Adams sets forth his

methodology in detail, which included comparing various documents issued and filed by

Defendant, along with compiling and comparing lists of employee names derived from these

documents. (Adams Report ¶¶ 38–44.)

Defendant argues that Mr. Adams's opinions regarding headcount must be excluded,

because they "impermissibly apply the law to the facts, they do not even apply the correct law to

those facts, and they rely on irrelevant documents that will only confuse the jury." (ECF No. 88

("Adams Reply") at 6 (citations omitted).) Defendant focuses much of its argument on the

applicability of 13 C.F.R. § 121.106(a) to the headcount calculation. (Adams Mem. at 16–20.)

---

producing its documents more promptly. As such, the Court rejects Defendant's hyperbolic
insinuations of impropriety.

It strenuously opposes both Adams's opinion that this regulation applies and his resulting opinion that Defendant failed to satisfy the PPP headcount criteria on the basis of its applicability, arguing that both are impermissible legal opinions. (*Id.* at 16–20, 23–24.) Adams's opinion on the eligibility question, in Defendant's telling, "decides the very issue at the heart of this case: that [Defendant] was ineligible for its PPP loan." (*Id.* at 14.) Defendant also claims that Adams misapplies 13 C.F.R. § 121.106(a), because he fails to consider the "totality of the circumstances" inquiry referenced in that regulation. (*Id.* at 19–20.)

Relator opposes all of Defendant's arguments. She submits that Defendant's critiques of Adams's methodology really constitute a dispute over "who Mr. Adams counts based on [Defendant's] own interpretation of legal guidance," a matter that falls "far outside the proper purview of a motion to exclude." (ECF No. 82 ("Adams Opp.") at 6.) Relator acknowledges that the "application of longstanding SBA guidance in the Code of Federal Regulations to the PPP is a legal question for the Court to determine." (*Id.* at 21.) However, Relator argues at great length that Mr. Adams's interpretation of those regulations — requiring the inclusion of temporary employees among a company's "individuals employed" — constitutes the proper reading of PPP requirements and therefore supports his opinion that Defendant would have been "precluded . . . from qualifying for the PPP Loan" if it had included temporary employees in its headcount. (Adams Supp. Report at 6; Adams Opp. at 9–11, 21–23.) Relator further argues that Adams's opinions concerning the proper headcount number "reflect an exercise in accounting" rather than legal opinions, and that these opinions are best challenged through cross-examination at trial, not a motion to exclude. (*Id.* at 7.) Finally, to the extent that Adams opined on the legal question of Defendant's eligibility for a PPP loan, Relator argues that Adams was merely "completing the logical syllogism" from his headcount calculations to an opinion about

10

eligibility, and that the prohibition on legal opinions "is not a persuasive ground to exclude his testimony." (*Id.* at 28.)

Turning first to Mr. Adams's opinions concerning the proper definition of "individuals employed" for purposes of the PPP requirements, the Court finds that these opinions constitute improper legal opinions and must be excluded. Determining whether 13 C.F.R. § 121.106's language concerning temporary employees applies to the SBA's requirements around PPP-loan eligibility requires interpretation of the relevant statutes and regulations. Such is the provenance of the Court, not a party's expert. *See Cortez*, 205 F. Supp. at 776 (noting that "an expert telling a judge how to interpret a rule or statute does nothing more than give an attorney a redundant means of presenting legal argument to the Court"). Relator even appears to acknowledge as much, stating that the "application of longstanding SBA guidance . . . to the PPP is a legal question for the Court to determine." (Adams Opp. at 21.) As such, Mr. Adams's opinions on this legal issue — coming, as they do, from a non-lawyer without any training to this effect — would prove entirely unhelpful to the jury and therefore must be excluded.

The same is necessarily true for Mr. Adams's opinion that, if Defendant had included its temporary employees in its 2019 headcount, it "would not have met the criteria to be eligible for a PPP loan and should have never received one." (Adams Supp. Report at 18.) This opinion impermissibly crosses into ultimate-issue territory. As Defendant correctly points out, Adams's testimony concerning whether Defendant did or did not qualify for PPP loans runs into the very prohibition, recognized by the Fourth Circuit, against "opinion testimony that . . . draws a legal conclusion by applying law to the facts." *McIver*, 470 F.3d at 562. While Relator submits that Adams merely "complete[s] the logical syllogism that [Defendant], a company with more than 500 employees, was not eligible for a PPP loan," (Adams Opp. at 28), the case law expressly

11

precludes Adams from taking that additional step, since doing so invades the jury's domain of deciding the issues properly before it. *See Offill*, 666 F.3d at 175 (reiterating that an expert opinion applying law to facts "supplies the jury with no information other than the witness's view of how the verdict should read," rendering it unhelpful, and thus inadmissible, under Rule 702). For all of these reasons, the Court excludes Mr. Adams's opinions concerning the PPP's headcount requirements and whether Defendant adequately satisfied them.[8]

The Court disagrees with Defendant, however, that Mr. Adams's proposed testimony concerning the 528-employee number must also be excluded. Unlike his conclusions concerning the proper interpretation of SBA guidance and Defendant's eligibility for PPP loans, Mr. Adams's calculation here is based on employment data provided to him by Defendant. The Court finds no basis to question the reliability of this calculation. Mr. Adams's credentials as a forensic accountant with two decades of experience and several accounting certifications speak for themselves. In addition, the Court understands Mr. Adams's methodology to involve relatively straightforward practices of tabulation and comparison of figures well within the skill set of a certified accountant. Further, he relied on Defendant's own representations and its chosen method of calculating employee headcount for PPP purposes in arriving at his results.[9] (Adams

---

[8]     Given the Court's decision to exclude Mr. Adams's opinions concerning Defendant's eligibility for PPP loans based on headcount, the Court need not analyze Defendant's arguments concerning the SBA's "totality of the circumstances" inquiry and Mr. Adams's purported failure to include it in his analysis. (Adams Mem. at 19–20.)

[9]     To the extent that Defendant attempts to restyle its objections to Mr. Adams's interpretation of the applicable SBA regulations into an argument on methodology, the Court agrees with Relator that the "true issue" here remains one of statutory interpretation, not method. (Adams Opp. at 7 n.1.) Mr. Adams's adoption of a legal interpretation that Defendant doesn't agree with does not constitute a flaw of "methodology" for purposes of the Rule 702 inquiry. Cf. *Westberry*, 178 F.3d at 260, 262 (defining *Daubert*'s methodology inquiry as focusing on whether expert opinions are "supported by adequate validation" and looking to procedure, not

Report ¶¶ 32, 37–44.) Defendant does not appear to take issue with this approach. While

Defendant criticizes Mr. Adams's consideration of data from IRS Form 941 and VETS Form

4212, (Adams Mem. at 21–22), Mr. Adams makes clear in his reports that he considered this data

for verification purposes and noted the inconsistencies that it revealed, but ultimately did not rely

on it in arriving at his calculations. (Adams Report ¶¶ 39–42; Adams Supp. Report at 7.) Nor do

Defendant's claims about Mr. Adams's purportedly inadequate experience with SBA-related

issues undercut his accounting expertise and his ability to arrive at a relatively straightforward

headcount calculation. (Adams Mem. at 22–23.)

However, the Court cannot yet assess whether Mr. Adams's 528-employee opinion will

be relevant at trial. That determination hinges on the contested legal question of whether SBA

regulations and guidance required businesses applying for PPP loans in early 2020 to include

temporary employees in their headcount calculations. If the answer to this question is yes, then

Mr. Adams's testimony would be both relevant and helpful to the jury's assessment of

Defendant's liability in this action and would pass Rule 702 muster. If the answer is no, the

Court would be likely to exclude the testimony, given the significant risk of juror confusion. As

the parties appear to concede, a *Daubert* motion presents the wrong forum for settling such legal

questions, particularly where the outcome may prove determinative of a party's claims. As such,

the Court will defer ruling on the admissibility of Mr. Adams's proposed testimony concerning

the 2019 528-employee headcount number until the underlying legal questions concerning PPP

headcount requirements have been resolved.

---

substance, in assessing whether expert's testimony was based on "reliable scientific
methodology.")

In sum, Mr. Adams's will not be permitted to testify at trial concerning his interpretation of the PPP headcount requirements and whether temporary employees must be included in such calculations. Mr. Adams will also not be permitted to testify as to whether Defendant failed to satisfy these eligibility requirements. However, the Court defers ruling on the admissibility of Mr. Adams's opinions concerning Defendant's 2019 actual employee headcount for purposes of its PPP application at this time.

### 2.    Economic Necessity Opinions

The Court next addresses Mr. Adams's opinions concerning Defendant's financial and business condition around the time of its PPP loan application. Adams's report proffers several opinions on this topic. He first outlines the relevant SBA guidance, in particular item 31 of the SBA's April 23, 2020 "Paycheck Protection Program Loans Frequently Asked Questions (FAQs)" guidance, which provides additional information to prospective borrowers concerning the Economic Necessity Certification and establishes a safe harbor for borrowers who repay their PPP loans in full by May 7, 2020 (later extended to May 18, 2020). *Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)*, U.S. SMALL BUS. ADMIN., at ¶ 31 (Apr. 23, 2020) [hereinafter *April 23 FAQs*], https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf (last visited August 18, 2025) [https://perma.cc/3X3T-Z57G]; (Adams Report ¶ 27.) Adams then makes several observations concerning Defendant's financial condition in the period leading up to submission of its PPP loan application, including that Defendant's "actual revenues and net profit in the first quarter of 2020 exceeded its quarterly projections." (*Id.* ¶ 47.) He also highlights Defendant's cash positions in March and April of 2020, which demonstrate "growth" during this period. (*Id.* ¶ 48.)

14

Based on internal correspondence, Adams proceeds to opine that Defendant's "management was not anticipating a negative impact to the business due to COVID at the time of the PPP Application." (*Id.* ¶ 49.) In apparent support thereof, Adams cites emails referring to the approved PPP loan as a "cash reserve" and indicating that Defendant's co-owners were planning to take a 25% distribution of net profits in 2020, in line with previous years. (*Id.*) He also highlights documents prepared by Defendant at the end of April 2020, which suggest that Defendant had increased its projections for 2020 from what had been projected before the outbreak of the pandemic. (*Id.* ¶¶ 50–51.) Adams cites different statements made by members of Defendant's management team around the time of its PPP loan application concerning Defendant's "days of cash on hand," with estimates ranging from 10 to 330 days, depending on methodology. (*Id.* ¶ 72.) The report also discusses various aspects of Defendant's financial condition from May 2020 onward. (*Id.* ¶¶ 52–54, 63–65, 70.)

On the basis of this information, Mr. Adams renders several opinions related to Defendant's business and financial condition at the time of its PPP loan application. Adams opines that Defendant maintained "consistent levels of working capital and cash reserves" when it filed its application. (*Id.* at 35.)[10] Adams also notes that Defendant "forecasted continued stability from ongoing and upcoming projects." (*Id.*) He opines that Defendant would have been able to maintain its payroll for all of 2020 without a PPP loan, based on its "ongoing cashflow, liquidity from cash reserves, and access to a line of credit." (*Id.*) Finally, Adams adds two seemingly unrelated opinions: that Defendant's planned use of the PPP loan funds "did not align

---

[10]    Due to apparent inconsistencies in the paragraph numbering of the report, the Court cites to the relevant ECF page number for Adams's conclusions.

with the goal of the PPP," and that Defendant's co-owner "took a non-tax distribution from the business" in 2020, which Defendant failed to report on its loan forgiveness application. (*Id.*)

Mr. Adams adds to these opinions in his Supplemental Report. There, he observes that, at the time of its PPP loan application, Defendant "was projecting only a 14.6% decrease in projected profit on a combined basis for 2020 and 2021," and that Defendant "was able to maintain significant cash reserves throughout 2020 in line with its cash balance as of March 2020." (Adams Supp. Report at 18.) He also provides observations concerning Defendant's financials "in the months following March 2020." (*Id.* at 19.)

In terms of methodology, Adams states that he reviewed financial information from Defendant and an affiliate entity, including annual financial statements, internal projections, Board meeting materials and correspondence. (Adams Report ¶ 46.) In arriving at his assessment of Defendant's financial condition at the time of its PPP application, Adams considered the following: Defendant's recent layoffs, which Defendant anticipated would increase profitability for the year by $5 million; the recognition of Defendant as an essential business by the state of Idaho; the fact that Defendant both lost and won contracts in March and early April 2020; Defendant's cash position at the start of 2020 and at the end of March 2020; and Defendant's access to a $10 million line of credit. (*Id.* ¶ 58.)

Defendant objects to Adams's opinions relating to Defendant's Economic Necessity Certification, arguing that the opinions are unreliable and misleading and rely on inapplicable guidance. (Adams Mem. at 25–29.) Defendant's critiques boil down to three main claims. First, Defendant asserts that Mr. Adams's invocation of Defendant's access to liquidity — a factor listed in SBA guidance that was published only *after* Defendant applied for its PPP loan — demonstrates his lack of understanding of the SBA and renders any opinions based on this non-

16

retroactive guidance irrelevant. (*Id.* at 25–26.)  Second, Defendant argues that Mr. Adams's lack of specific prior experience in assessing construction companies similarly undermines the reliability of his opinions about Defendant's economic condition. (*Id.* at 26–27.) And finally, Mr. Adams's failure to consider the effects of "local restrictions" (as opposed to statewide rules) on Defendant's ability to complete projects demonstrates a fatal methodological flaw that renders his opinions about the lack of pandemic impacts on Defendant's business unreliable. (*Id.* at 27.)

As with Adams's opinions on Defendant's 2019 headcount, Relator argues that Defendant's complaints about Adams's economic necessity opinions concern a "legal issue poorly disguised as a matter of Mr. Adams's experience." (Adams Opp. at 7.) Relator submits that the "general accounting principles Mr. Adams used to evaluate [Defendant's] financial condition" stand unaffected by the interpretive dispute between the parties about the applicable guidance. (*Id.*) Relator also rejects Defendant's "insist[ence] upon hyper-specific qualifications," citing case law to support the proposition that "educational and experiential qualifications in a general field closely related to the subject matter in question" suffice to render an expert reliable. (*Id.* at 31 (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)).) Finally, Relator disagrees with Defendant's specific concerns about Adams's lack of experience with the construction sector and the SBA, arguing that he "works on PPP matters in his current role" and "is generally familiar with SBA guidance through his experience as an accountant," and that Defendant "insist[s] on a level of granularity that does not exist and that courts . . . have resoundingly decried." (*Id.* at 17, 27.)

The Court begins by addressing Defendant's objections to Adams's use of "access to liquidity" as a factor in his assessment of Defendant's economic condition in early 2020. Defendant's accusation that Adams's reliance on this factor demonstrates his "lack of

understanding of the SBA regulations" and its insinuation that liquidity somehow stands "irrelevant" to assessing economic insecurity and necessity — merely because it appears in later SBA guidance — both miss the mark. (Adams Mem. at 25–26.) As a threshold matter, the Court notes that it does not require an advanced degree in accounting to understand that a company's ability to access money is a prerequisite to paying its employees. The SBA's suggestion that borrowers "tak[e] into account . . . their ability to access other sources of liquidity sufficient to support their ongoing operations" when assessing whether they actually need a PPP loan highlights the obvious and common-sense nature of this inquiry. *April 23 FAQs* at ¶ 31. While the fact that the SBA issued this language *after* Defendant's application date may affect its relevance to the question of the legality of Defendant's certification, that is not the question Mr. Adams opines on — nor would the Court allow him to do so, since that would render his opinion a legal one. Rather, he opines on Defendant's financial condition, and in so doing, relies on various factors, including common sense metrics like access to liquidity, to arrive at his conclusions. *Cf. United States ex rel. Miller v. ManPow, LLC,* 2023 WL 9005796, at *5 (C.D. Cal. Nov. 22, 2023) ("That the SBA did not provide a specific instruction for PPP applicants to consider [specific] data in assessing their financial need does not mean that relying on such information was precluded, or even uncommon.") Such reliance demonstrates neither ignorance nor irrelevance. The Court therefore rejects Defendant's argument for exclusion on this ground.

The Court also disagrees with Defendant's arguments concerning Mr. Adams's lack of specific experience with the construction industry. Mr. Adams's report focuses on corporate financial information, including projected profits, cash reserves, credit lines, financial projections and cashflow. To the extent that his methodology requires explanation, it appears that Mr.

Adams reviewed Defendant's financial information and correspondence that was provided to him and then performed basic mathematical processes to derive conclusions from these documents. (Adams Report ¶ 46.)  As before, the Court finds Mr. Adams's accounting credentials sufficiently robust to determine that the opinions crafted on the basis of his evaluation of corporate financial documents are sufficiently reliable for *Daubert* purposes.  By contrast, and as Relator accurately highlights, Defendant offers no authority to support the notion that a certified accountant with twenty years of experience cannot interpret standard financial documents and internal company communications without also possessing experience in a specific industry.  (Adams Opp. at 32.) Defendant may, of course, bring out the sparsity of Adams's construction experience on cross-examination and thereby seek to undermine his opinions on Defendant's financial condition. However, the Court declines Defendant's request to exclude his opinions on this ground.

The specifics of Adams's proposed opinions concerning Defendant's business and financial condition do, however, raise significant concerns as to their relevance and the potential for juror confusion.  As neither party disputes, the central relevance of Mr. Adams's testimony about Defendant's financial condition in 2020 concerns Defendant's certification, in its PPP loan application, that "[c]urrent economic uncertainty makes this loan request necessary to support [Defendant's] ongoing operations."  85 Fed. Reg. 20811, 20814 (Apr. 15, 2020).  Defendant made this certification to the SBA on April 10, 2020.  (Adams Report ¶ 12.)  Neither party suggests that the PPP imposed any kind of ongoing certification requirement concerning economic necessity, or that PPP loan recipients were statutorily required to continue experiencing economic uncertainty once they had received their PPP loan.  Thus, to constitute evidence that is relevant to whether Defendant possessed "current economic uncertainty" in April 2020, any proposed testimony by Mr. Adams must have a "tendency to make [any alleged

misrepresentation by Defendant on April 10, 2020] more or less probable than it would be without the [testimony]." Fed. R. Evid. 401(a).

Much of Mr. Adams's discussion of Defendant's business and financial condition fails this basic relevance requirement and warrants exclusion for that reason. While Adams's key conclusions appear to steer clear of post-April 10, 2020 territory, Adams extensively discusses financial information and statements by Defendant that postdate its Economic Necessity Certification, often by many months. This includes Adams's discussion of Defendant's ability to maintain significant cash reserves throughout 2020, including its cash on hand at the end of 2020, (Adams Report ¶ 73); owner distributions taken from the business throughout 2020, (*id.* ¶ 74); Defendant's encouraging financial results in the months following April 2020, (*id.* ¶¶ 63–65); and the improved financial projections that Defendant prepared in late April 2020. (*Id.* ¶¶ 50–51). Evidence of Defendant's ability to successfully weather the first months of the COVID-19 pandemic sheds no light on how it perceived its economic situation to be on April 10, 2020. This evidence does, however, raise a serious risk of confusing the jury as to the issues before it and create a risk of undue prejudice against a Defendant that thrived economically while much of the country was in distress. For all of these reasons, the Court excludes Mr. Adams's testimony concerning Defendant's financial and business condition after April 10, 2020.

The Court emphasizes, however, that this decision does not impose an arbitrary cut-off date on admissible testimony based solely on when the underlying information was produced. To the extent that Mr. Adams's testimony sheds light on Defendant's reasonable beliefs about its economic situation on or before April 10, 2020, such testimony may reference information prepared or communications made in the immediate aftermath of that date. That includes

20

testimony concerning Defendant's future plans for its PPP funds, so long as these plans shed light on Defendant's reasonable beliefs about its economic situation on or before April 10, 2020.

The Court finally turns to Mr. Adams's additional opinions addressing issues beyond the Economic Necessity Certification. As to his opinion that Defendant planned to use PPP loan funds in a manner that "did not align with the goal of the PPP," the Court finds this opinion neither relevant nor helpful to the jury and thus excludes it. (*Id.* at 66.) By discussing the "goal of the PPP," Mr. Adams appears to opine on legislative intent, for which he lacks proper credentials and expertise. Furthermore, the extent to which recipients use funds in ways that "align" with the PPP's "goal" does not speak to any of Relator's legal claims in this litigation, dooming this testimony on basic relevance grounds as well. As to the admissibility of Mr. Adams's testimony concerning Defendant's co-owner taking a distribution of $1.5 million from Defendant in July 2020 and Defendant stating otherwise in its subsequent application for loan forgiveness, the Court defers making such a determination at this time. (*Id.*) Depending on Relator's legal theory at trial, this testimony may prove relevant to arguments pertaining to Defendant's alleged misstatements in its April 2020 certifications, which are central to this litigation. Defendant may raise any such objection as necessary again at trial.

In sum, the Court finds Mr. Adams's opinions concerning Defendant's business and financial condition at the time of its April 10, 2020 PPP loan application sufficiently reliable and relevant for purposes of Rule 702. These opinions include his proposed testimony that Defendant maintained "consistent levels of working capital and cash reserves" at the time of its application, forecasted "continued stability from ongoing and upcoming projects" in 2020 and would have been able to maintain its payroll for all of 2020 without a PPP loan, based on its "ongoing cashflow, liquidity from cash reserves, and access to a line of credit" in early 2020.

21

(*Id.*)  However, Mr. Adams may not testify to financial or other information postdating the April 10, 2020 certification that does not directly shed light on Defendant's reasonable beliefs about its economic situation on or before April 10, 2020, as such testimony lacks relevance and may confuse the jury.  Nor may Mr. Adams testify about whether Defendant's planned use of its PPP funds aligned with the purported goals of the program.

### 3.    Rebuttal Opinions

The Court next considers Mr. Adams's rebuttal opinions concerning the report prepared by Defendant's proposed expert, Ms. Martinez.  Mr. Adams highlights a host of factual disagreements with her report and flags several purported omissions on Ms. Martinez's part.  As relevant to Defendant's instant Motion, Adams also proffers several opinions of his own, namely that (1) the "industry-wide impacts of the COVID-19 pandemic were seemingly more severe than [Defendant's] expectations around the time of loan application;" (2) Defendant "was able to maintain significant cash reserves throughout 2020 in line with its cash balance as of March 2020;" and (3) Defendant's characterization of the $8.6 million PPP loan amount as a "rainy day fund" "provides further evidence of [Defendant's] cash and overall financial position."  (Adams Supp. Report at 18–19.)

Seeking to exclude these opinions, Defendant essentially rehashes the same arguments concerning Mr. Adams's lack of experience within the construction sector that the Court already considered above.  Defendant specifically cites this lack of experience as undermining Adams's ability to opine on Defendant's cashflow, as cashflows have "unusually high fluctuations in the construction industry."[11]  (Adams Mem. at 28.)  Defendant also points up other shortcomings on

---

[11]      In a touch of irony, Defendant's accusation that Mr. Adams has no basis for his pronouncements on cashflows lacks a factual basis of its own.  Defendant claims that "cash

Mr. Adams's part, including his failure to "conduct[] [any] analysis of the construction industry" in reaching his conclusion about the purported "industry-wide impacts" of COVID-19 and his failure to consider local restrictions that might have prevented Defendant from completing projects, irrespective of Idaho designating the construction industry as "essential." (*Id.* at 27.)

To the extent that the opinions in Mr. Adams's Supplemental Report center on his analysis of Defendant and its financial condition, the Court reiterates its earlier ruling and finds them sufficiently reliable for Rule 702 purposes. The Court refers back to its discussion of Mr. Adams's credentials as a forensic accountant. *See supra* Section III.A.1. Given the generalized nature of his financial analysis and his documented "educational and experiential qualifications in [the] general field" of accounting, the Court finds that Mr. Adams's credentials and extensive accounting experience suffice to render his financial analyses (and any opinions based thereon) sufficiently reliable, despite his lack of specific experience in the construction industry. *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282.

That finding does not, however, extend to Mr. Adams's first proposed rebuttal opinion, in which he compares Defendant's expectations of the COVID-19 pandemic's effects to its actual "industry-wide impacts." (Adams Supp. Report at 18.) As Relator herself submits, Mr. Adams "is proffered to opine on the financial condition of [Defendant], not the general construction industry." (Adams Opp. at 31.) The Court takes Relator at her word. Consequently, and in light

---

flows and reserves have unusually high fluctuations in the construction industry," rendering any analysis by Mr. Adams, who fails to consider this purported "fact," so unreliable as to warrant exclusion. (Adams Mem. at 28.) In support of this claim about the construction industry, Defendant cites depositions of current and former management. (*Id.*) However, neither deponent makes any such representation as to the construction industry at large, nor to any construction industry player *other than Defendant itself.* (ECF No. 75-5 at 207:18–23; ECF No. 75-6 at 101:15–102:12.) Such unsubstantiated pronouncements fail to advance Defendant's arguments for exclusion and serve only to undermine the Court's faith in these representations.

of his lack of experience in this specific arena, the Court limits Mr. Adams's rebuttal testimony to facts and opinions concerning the financial condition of Defendant and precludes him from opining on the economic conditions of the construction industry at large.[12]

### 4.    Damages Opinions

Lastly, the Court considers Defendant's arguments as to Mr. Adams's proffered opinions concerning damages. Mr. Adams explains that he "calculated damages according to statutory allowances in the FCA," which include damages sustained by the Government and a penalty. (Adams Report ¶¶ 32, 79 (citing 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5).) Yet, somewhat perplexingly, Mr. Adams never states an actual opinion as to the proper outcome of those calculations. Instead, in the "Damages" section of his report, Adams merely sets forth the various statutory and regulatory provisions, repeats Relator's allegations concerning Defendant's PPP loan amount of $8,607,900 and then states that damages are "3 times the amount of damages which the Government sustains because of [Defendant's] acts, plus a maximum penalty of $27,894 per civil violation." (Adams Report ¶¶ 76–79.) Defendant argues for exclusion, claiming that testimony by Mr. Adams "regarding the FCA's damages framework and assessment of penalties would be inappropriate." (Adams Mem. at 24 n.6.) Relator, in turn, rejects Defendant's claims of impropriety as contrary to the "common practice of offering an expert to opine on damages in FCA actions." (Adams Opp. at 29 n.23.)

The Court agrees with Defendant and excludes Mr. Adams's proposed testimony. Testifying as to the FCA's damages framework would impermissibly allow Mr. Adams to instruct the jury on legal matters and infringe upon "the role that the judge has in instructing the jury on

---

[12]    The Court notes that this limitation shall not, however, prevent Mr. Adams from distinguishing Defendant's financial condition from that of the broader construction industry, should Defendant's expert witness provide testimony on the latter.

24

the law." *Offill*, 666 F.3d at 175.  Nor would such testimony be helpful to the jury, since it will already receive essentially the same information from the Court in its instructions.

Consequently, any testimony by Mr. Adams concerning the FCA's statutory damages framework shall be excluded.

### B.    Frost Motion

Defendant's expert Ms. Frost proffers testimony primarily on the PPP, including its background, context and requirements, as well as its implementation by the SBA.  (Frost Report ¶ 12.)  Her supplemental report, meanwhile, seeks to rebut Mr. Adams's opinions on Defendant's 2019 average headcount and its potential impact on Defendant's eligibility for PPP funding. (ECF No. 78-8 ("Frost Supp. Report").)  In support of her purported expertise on these topics, Ms. Frost cites her nearly four-year tenure at the SBA, beginning approximately one year after the SBA launched and implemented the PPP in 2020.  (Frost Report ¶ 1.)  From March 2021 through December 2023, Ms. Frost's responsibilities at the SBA included supporting "PPP Phase 3" and "core elements of the PPP forgiveness program."  (*Id.* ¶ 4.)  In addition, she "was involved" in the creation of "many" PPP policy updates, revisions and guidance.  (*Id.*)  She also "interacted with lenders from across the country that participated in the PPP" and "spoke directly with many PPP borrowers."  (Frost Supp. Report ¶ 18.)  During her final year with the SBA — which began nearly eighteen months after Relator filed her complaint in this case — Ms. Frost served as Associate Administrator for the Office of Capital Access, where she bore responsibility for "issuing rules and regulations that governed loan programs."  (Frost Report ¶ 3.)  Ms. Frost notes that, throughout her tenure at the SBA, she never herself reviewed or made decisions on the eligibility of individual PPP loan files.  (Frost Supp. Report ¶ 26.)  Before joining the federal government in 2021, Ms. Frost worked in various capacities with a focus on analytics and

"operational improvement." (Frost Report ¶ 5.) Ms. Frost holds degrees in political science and public policy. (*Id.* at 47.) Her report does not specify any previous work as an expert in litigation or any publications in her field of expertise.

Relator seeks to exclude Ms. Frost's opinions in their entirety. Relator argues that Defendant seeks to impermissibly "use Ms. Frost's opinions to suggest [] legal interpretation[s] to the Court" concerning the PPP rules and regulations in question. (ECF No. 77 ("Frost Memorandum of Law" or "Frost Mem.") at 5–6.) In support of her argument, Relator cites *United States ex. rel. Miller v. ManPow, LLC*, a recent FCA case where the plaintiff similarly alleged that the defendant had made false certifications to obtain PPP funds. 2023 WL 9005796 (C.D. Cal. Nov. 22, 2023). There, the court found that a proposed expert's opinions on the proper definitions of specific terms contained in PPP regulations, along with the purpose and intent of certain regulations and requirements, were "excludable as improper expert testimony on the meaning of statutes and regulations." *Id.* at *9. Relator restates this argument for Ms. Frost's opinions concerning employee headcount and PPP eligibility. (Frost Mem. at 13.) To the extent that Ms. Frost's opinions provide background information concerning the PPP, Relator argues that these, too, must be excluded, as these opinions have been "infect[ed]" by the impermissible legal opinions discussed above. (*Id.* at 11.)

Alternatively, beyond Ms. Frost's "legal conclusions" and interpretations of PPP and SBA regulations, Relator argues that Ms. Frost's testimony is that of a percipient witness, not an expert. (*Id.* at 6.) Relator also points out that Ms. Frost "did not work at the SBA when the PPP was established" and was never "in a role where it was [her] job to review and make decisions about individual loan applications for PPP." (*Id.* at 6, 6 n.3.) As such, Relator argues that Ms. Frost's testimony on background matters cannot be helpful, since "she was not associated with

the SBA when the PPP was established," (*Id.* at 12), and lacks any "firsthand knowledge of the SBA's purpose or intent behind regulations and guidance" that were created before her arrival. (ECF No. 89 ("Frost Reply") at 6.)

Defendant counters that Ms. Frost's testimony about the history and operation of the PPP provides reliable information that would help the jury assess Relator's allegations against Defendant. (ECF No. 80 ("Frost Opp.") at 7, 14.) In support, Defendant touts Frost's qualifications, particularly her years at the SBA working on PPP-related issues and the "specialized knowledge" that she acquired while doing so. (*Id.* at 6–7, 15.) Defendant also cautions that excluding Ms. Frost's testimony would "leave the jury largely in the dark on the notoriously complicated PPP," rendering an "educated verdict" all but impossible. (*Id.* at 6.) Defendant further submits that the case law supports having experts provide such background testimony, citing both the Fourth Circuit's opinion in *United States v. Barile*, 286 F.3d 749 (4th Cir. 2002) and other cases where courts permitted experts to testify about the procedure, practice and history of statutory and regulatory regimes. (*Id.* at 15.)

As to relevance, Defendant submits that the context of the PPP's introduction and administration, including the SBA's continuing issuance of new guidance even after the program's launch, directly impact the underlying liability issues in this case. (*Id.* at 16.) Frost's opinions fall outside the ambit of impermissible legal opinions, Defendant argues, because she neither "applies facts to the law and tells the jury what verdict to reach" nor "offer[s] specialized vernacular that draws a legal conclusion for the jury." (*Id.* at 6, 22.) Finally, Defendant argues that the Fourth Circuit recognizes an exception to the prohibition on experts offering legal opinions when, as here, "the legal regime is complex" or "highly technical legal issues" stand at issue. (*Id.* at 18 (quoting *Offill*, 666 F.3d at 175).) Defendant denies that Ms. Frost's testimony

27

includes impermissible statutory and regulatory interpretations, as she "does not define any terms" and does not "insist that one process or another was applicable to [Defendant]." (*Id.* at 25.) As to Ms. Frost's rebuttal testimony, Defendant specifically invokes the importance of permitting her to testify on these issues, given Mr. Adams's "improper and unreliable" report and the ensuing risk of juror confusion. (*Id.* at 6.)

The Court begins its analysis by breaking down Ms. Frost's proposed testimony into two broad areas: factual background testimony and interpretative or opinion testimony. As to the former category, Ms. Frost's report sets forth proposed testimony on the following issues:

1.    The SBA generally and its pre-COVID work. (Frost Report ¶¶ 13–15.)

2.    The traditional rulemaking process for federal agencies. (*Id.* ¶ 25.)

3.    The economic landscape facing small businesses at the start of the COVID pandemic. (*Id.* ¶ 20.) This includes information indicating that small businesses suffered negative impacts from the pandemic in April and May of 2020, noting specifically that the pandemic "caused significant financial damage to many small businesses and introduced broad uncertainty across the country," with small businesses "particularly hard hit." (*Id.* ¶¶ 12, 20.) Ms. Frost also opines that "[m]ost Americans, including small businesses, faced considerable uncertainty throughout the pandemic, especially in the first few months." (*Id.* ¶ 48.)

4.    The CARES Act and the PPP, including its original statutory framework and structure, Congress's definition of a "small business" for purposes of the PPP (and how this definition differed from the SBA's traditional criteria), and permissible uses of PPP funds, including caps on individual payroll costs. (*Id.* ¶¶ 12, 16, 19, 22–24, 54–55.)

5.    SBA's scaling and administration of programs under the CARES Act, particularly the PPP. This includes SBA's implementation and administration of the PPP in 2020 and 2021

28

(including the issuance of interim final rules, FAQs and other guidance, and revisions and updates after the program's launch, which Ms. Frost describes as "quick[]" and "unconventional"); the PPP application process, including the need for businesses to self-assess their eligibility; the volume of applications received; SBA's use of a "first-come-first-served" approach for PPP applications; SBA's evolving guidance on how employees should be counted for the PPP; and the expanded group of lenders with whom SBA partnered. (*Id.* ¶¶ 17, 24–26, 40–42, 56–57, 59.)

6.      The encouragement provided to small businesses by government leaders and business support organizations to apply early to the PPP. (*Id.* ¶ 26.)

7.      Subsequent legislative changes to the PPP that, in turn, necessitated new guidance and policy. This includes SBA's policy that borrowers "were entitled to rely on guidance available at the time that they applied for the loan." (*Id.* ¶¶ 29–31.)

8.      The PPP's "economic uncertainty" requirement and its reliance on a good-faith certification by the applicant, as well as SBA's clarifying guidance, issued in April 2020 and May 2020, concerning this requirement. (*Id.* ¶¶ 44–47.)

9.      Loan forgiveness under the PPP, including the criteria used by the SBA to assess a loan recipient's eligibility for forgiveness. (*Id.* ¶¶ 61–67.)

10.     The SBA's introduction of a mandatory Loan Necessity Questionnaire ("LNQ") and its decision, less than one year later, to discontinue this requirement. (*Id.* ¶¶ 68–71, 73.)

11.     The CARES Act's specifications as to PPP eligibility based on a business's size, including the system for size classification in pre-pandemic SBA loan programs (as well as the proper timing and method for counting employees and for considering "affiliation") and the Act's

unique provision that a business could have either a maximum of 500 employees or qualify under SBA's pre-pandemic size standards. (*Id.* ¶¶ 35–40, 43.)

As to interpretative or opinion testimony, the Court notes the following statements in Ms. Frost's report:

1.    Various statements concerning Congress's purpose in establishing the PPP and its goals and motivations for the program, including:

      a.    The goal of SBA pandemic programs, including the PPP, was "to stabilize small businesses through the resulting stress and economic strain" caused by the COVID-19 pandemic, including by "helping them to retain employees and cover operating expenses." (*Id.* ¶¶ 12, 21.)

      b.    Congress's purpose in establishing the PPP was to "provide expeditious relief to small businesses during a period of incredible uncertainty." (*Id.* ¶ 20.)

      c.    Congress selected the SBA to administer the PPP due to its "longstanding expertise in loan making and partnerships with small business lenders" and to "ensure the programs focused directly on aiding ***small*** businesses," rather than larger entities. (*Id.* ¶ 18 (emphasis in original).)

      d.    Congress based its drafting of PPP provisions "on the core [tenets] of SBA's 7(a) program, the Agency's flagship business loan program." (*Id.* ¶ 22.)

      e.    The PPP's goal was to "maintain operations through uncertainty and avoid or mitigate personnel layoffs." (*Id.* ¶ 12.)

      f.    The PPP's "primary purpose" was to "support payroll costs." (*Id.* ¶ 50.)

     g.     Congress did *not* intend PPP "as a tool for growth or expansion, nor was it intended <u>only</u> for those businesses that would have been forced to fold without it." (*Id.* ¶ 21 (emphasis in original).)

2.     Statements concerning SBA's decision to award PPP funding on a first-come-first-served basis, including:

     a.     This decision placed small businesses "on the crux of a dilemma," where they needed to either "jump into PPP quickly or risk missing out." (*Id.* ¶ 26.)

     b.     Thus, this policy created a "challenging environment for small businesses, lenders, and the SBA," and was "especially difficult for smaller businesses," including "businesses in rural areas where it was more difficult to access lenders." (*Id.* ¶ 27.)

     c.     SBA's subsequent decision to avoid first-come-first-served policies going forward was made "to avoid the rush and confusion" created by this policy in the PPP context. (*Id.*)

3.     When Congress creates new statutory programs, it automatically gives authority to the relevant agency administering the program to decide the details of how to operate that program. (*Id.* ¶ 25.)

4.     Other statements concerning SBA's intentions in the early stages of implementing the PPP, including:

     a.     SBA's intention in crafting rules and guidance for the PPP was to "make the regulations easier for businesses and lenders to understand." (*Id.* ¶ 43.)

     b.     SBA opted to have applicants self-certify as to their economic uncertainty "likely due to the rapid implementation of the program and the inherent difficulty in quantifying and assessing uncertainty." (*Id.* ¶ 44.)

5.      Statements concerning PPP applicants' motives or states of mind, including:

a.      When self-certifying for economic uncertainty, small businesses "were influenced by applicants' perceptions of" a host of factors, including "possible impacts on their ongoing business operations from stay-at-home orders" and "fast changing data about the pandemic." (*Id.* ¶ 45.) "[T]hese factors were changing rapidly across the country" in the early months of the pandemic. (*Id.*)

b.      When looking for help, PPP applicants turned to lenders, not the SBA or the Government, for information. Some of these lenders, in turn, "provided bad guidance to their small business applicants." (*Id.* ¶ 58.)

In her supplemental report, Ms. Frost primarily seeks to rebut Mr. Adams's opinions concerning Defendant's 2019 average headcount (and, consequently, Defendant's eligibility for a PPP loan). Specifically, she opines that applying 13 C.F.R. § 121.106, which sets forth SBA's "non-pandemic, traditional size standard regulations," to businesses who calculate their employee headcount under the PPP-specific "500-employee headcount methodology" is "inconsistent with my experience" at the SBA. (Frost Supp. Report at 1, ¶¶ 3–7.) To rebut Mr. Adams's contrary opinion, she cites several factors, including what she deems to be Congress's and the SBA's aim "to make [the PPP] clearer and broader," other instances where (unlike here) SBA clearly expressed the applicability of 13 C.F.R. § 121.106, and her interpretation of a Treasury Department PPP Information Sheet, which she believes stands irrelevant, because the SBA "does not impose new requirements through a document like this." (*Id.* ¶¶ 6–13.) Relatedly, she also seeks to undermine Adams's claim concerning 13 C.F.R. § 121.106's applicability by labeling his expectation that borrowers would look to this regulation for guidance as "unrealistic." (*Id.* ¶ 18.) Ms. Frost further opines that, even if 13 C.F.R. § 121.106

32

applied to PPP applicants using the 500-employee approach, the regulation's "totality of the circumstances" language would require the SBA to look beyond mere headcount numbers and engage in a holistic eligibility determination. (*Id.* ¶¶ 23–24.) She also reports that, based on her time at the SBA, she is "not aware of any PPP loans in which temporary employees from temporary staffing agencies were counted as 'employees'" under 13 C.F.R. § 121.106. (*Id.* ¶ 26.)

The Court begins by assessing the reliability of Ms. Frost's opinions, specifically with regard to her expertise and knowledge. *Cf. Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (requiring that expert opinions be based on "scientific, technical, or other specialized *knowledge* and not on belief or speculation."). The Court finds no reason to question Ms. Frost's extensive experience handling PPP-related issues during her time at SBA, including her senior role involving responsibility for implementing loan programs, including the PPP. However, the timing of Ms. Frost's employment at the SBA, and the relatively junior role that she played during all times relevant to this litigation, raise significant concerns about her ability to provide reliable testimony on several of the topics addressed in her reports. As previously discussed, Ms. Frost joined the SBA in March of 2021; by that point, the PPP had been fully operational for nearly one year.

Furthermore, while she may have been involved in supporting "PPP Phase 3" and the program's loan forgiveness process, she did not bear meaningful responsibility for any agency action until her promotion to Associate Administrator in December 2023 — nearly one and a half years after Relator initiated this litigation, and several years after the program's implementation. Nevertheless, Ms. Frost opines extensively on Congress's 2020 decision to create the PPP, including its purpose in establishing the program, its goals and motivations in doing so, its reasons for choosing the SBA as the administrator of the PPP, its bases for drafting specific PPP

33

provisions, and its intentions for the PPP as a whole. Given that Ms. Frost was neither employed at the SBA nor anywhere else in the federal government during the lead up to the PPP's enactment and the first year of its existence, and given the absence of any other evidence suggesting "satisfactory knowledge [and] experience . . . on the issue[s] for which the opinion is proffered," the Court finds that Ms. Frost's proposed testimony on Congress's intent or purpose relative to the PPP's creation and implementation lacks a sufficiently reliable foundation for purposes of Rule 702. *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 254 (4th Cir. 2025). The Court therefore excludes any testimony by Ms. Frost on these topics.

The Court arrives at the same conclusion concerning Ms. Frost's opinions on the actions and motivations of small businesses before her arrival at the SBA in March 2021, including the economic environment that these businesses faced during the early stages of the pandemic. While Ms. Frost references "interact[ions] with lenders from across the country that participated in the PPP" and direct conversations "with many PPP borrowers," these conversations — whose context and contents she does not detail — provide no more than anecdotal support for the kinds of sweeping macroeconomic pronouncements that she renders. (Frost Supp. Report at 11.) Nor does anything in her background as a management consultant or "operational improvement" specialist suggest particular knowledge or expertise as to the economic challenges or decision-making processes of small businesses during the early days of the COVID-19 pandemic. As such, the Court finds the foundation for Ms. Frost's opinions about small businesses and their experiences during the early stages of the COVID-19 pandemic insufficiently reliable for Rule 702 purposes and excludes her proposed testimony on these topics.[13]

---

[13]    The Court's ruling also applies to Ms. Frost's opinions concerning the encouragement given to small businesses by government leaders and business support organizations that they

34

Ms. Frost's proposed testimony concerning the SBA's decision-making processes during the PPP's implementation, including the purported motivations for its decisions and their effects on small businesses during the early stages of the pandemic, fares no better in the Court's analysis. This testimony presents a closer call, given Ms. Frost's subsequent service with the SBA and her direct engagement, through her daily work, with many of the consequences of these early-stage decisions. Nevertheless, her absence from the SBA or any other branch of the federal government during this critical and tumultuous time significantly undercuts the notion that she possesses sufficiently specialized knowledge or expertise to render her testimony on these topics helpful to the jury.[14] The Court therefore excludes her testimony on these issues as well.

However, Relator's arguments for exclusion of Ms. Frost's more generalized background testimony fail to persuade the Court. This testimony includes her statements about the SBA generally, including the scope of its pre-COVID work and the traditional rulemaking processes that federal agencies (including the SBA) typically follow,[15] as well as her statements describing

---

should apply early to the PPP — events that, again, transpired well before Ms. Frost began working with small businesses at the SBA. (Frost Report ¶ 26.)

[14]    Other courts have excluded similar expert testimony concerning Congressional intent and the SBA's motivations regarding the PPP's statutory and regulatory regime as impermissible legal opinions. *See, e.g.*, *ManPow*, 2023 WL 9005796, at *9 (excluding expert testimony in a similar case concerning PPP fraud where that testimony concerned "the definitions and purpose of certain statutory PPP loan requirements, the intent behind certain PPP regulations promulgated by the SBA . . . what the SBA did and did not require in providing loan forgiveness [and] Congress's intent in designing and enacting the PPP" as "improper expert testimony on the meaning of statutes or regulations."). Since Ms. Frost's opinions fail for lack of reliability, the Court need not address whether they also constitute impermissible legal opinions.

[15]    The background information to which Ms. Frost may testify does not, however, include her opinion that "when Congress creates a new program through statute, they give authority to the Federal Agency administering the program to decide the details of how to operate the program." (Frost Report ¶ 25.) This pure statement of law not only exceeds any expertise that Ms. Frost might plausibly possess, based on her experience at the SBA, but also stands legally

the CARES Act's passage and subsequent creation of the PPP. It also covers the PPP's statutory

and regulatory structure (including its evolution over time), permissible uses of PPP funds and

the guidance issued by the SBA on various PPP-related issues. Furthermore, the Court includes

in this category of testimony Ms. Frost's explanation of what she terms the PPP's "economic

uncertainty" requirement, the Loan Necessity Questionnaire, and the loan forgiveness process

under the PPP, including the criteria employed by the SBA in evaluating whether to forgive a

PPP loan.

Such background information on the PPP and how it worked in practice will be helpful to

jurors seeking to understand the nature and context of Plaintiff's allegations and certain defenses

that Defendant may seek to assert. *Cf. Offill*, 666 F.3d at 175 (emphasizing that Rule 702's

"touchstone" remains "whether the testimony will assist the jury."). Courts regularly admit such

background information as expert testimony in complex cases, including PPP-related litigation.

*See, e.g.*, *United States v. Blair*, 2021 WL 5040334, at *13 (D. Md. Oct. 29, 2021) (finding that,

in cases featuring "intricate" regulatory landscapes and complex legal regimes, "the testimony of

a qualified expert could be helpful in providing background information to the jury with regard

to the statutory and regulatory schemes." (citing *Offill*, 666 F.3d at 175)); *United States v. Pac.

Gas & Elec. Co.*, 2016 WL 3268994, at *1 (N.D. Cal. June 15, 2016) (finding that "expert

testimony to help the jury digest [the] complex regulatory framework is necessary and

---

incorrect. *See, e.g.*, MAEVE P. CAREY, CONG. RSCH. SERV., IF10003, AN OVERVIEW OF FEDERAL
REGULATIONS AND THE RULEMAKING PROCESS (March 19, 2021),
https://www.congress.gov/crs_external_products/IF/PDF/IF10003/IF10003.5.pdf (last visited
August 18, 2025) [https://perma.cc/B43K-MQNQ] ("Congress *often* grants rulemaking authority
to federal agencies to implement statutory programs.") (emphasis added); *Nat'l Latino Media
Coal. v. FCC*, 816 F.2d 785, 788 (D.C. Cir. 1987) ("*When* Congress delegates rulemaking
authority to an agency, and the agency adopts legislative rules, the agency stands in the place of
Congress and makes law.") (emphasis added).

warranted"); *Marshall v. Prestamos CDFI, LLC*, 2025 WL 1250023, at *5 (E.D. Pa. Apr. 30, 2025) (finding that the testimony by former SBA employees providing "background information on the CARES Act, the PPP, and the relevant regulations" satisfied *Daubert* and did not constitute an impermissible legal opinion). Given the valuable background and context that this testimony provides, and given its relevance to legal issues underpinning this action, the Court finds that Ms. Frost's background testimony would be helpful to jurors in their resolution of essential issues in this case, supporting a finding of admissibility under Rule 702. Ms. Frost's multiple years of service with the SBA and her extensive exposure to the PPP as part of her duties render her testimony on these topics sufficiently reliable. The Court therefore permits Ms. Frost to testify on these topics in line with her reports.

Ms. Frost's proposed testimony about size eligibility requirements for PPP loans presents a closer call. Defendant seeks to have Ms. Frost testify that businesses were "eligible based on size if they either (1) had 500 or fewer employees, . . . or (2) they qualified under SBA's non-pandemic size standards." (Frost Opp. at 11 (citing Frost Report ¶¶ 12, 40).) In addition, Frost plans to testify that the SBA "provided applicants several methods to determine employee count for this purpose." (Frost Report ¶ 12.) In support of these statements, Frost cites to the CARES Act itself, which called for insertion of the following language at 15 U.S.C. § 636(a)(36)(D):

> (D) Increased eligibility for certain small businesses and organizations.—
>> (i) In general.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—
>>> (I) 500 employees; or
>>> (II) if applicable, the size standard in number of employees established by the [Small Business]

> Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 288 (2020). As to how applicants should count

employees under these requirements, Ms. Frost cites to an SBA guidance document released in

April 2020, which sets forth the following:

> In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019. An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.

> Borrowers may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard. Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months).

*Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)*, U.S. SMALL BUS.

ADMIN., at ¶ 14 (Apr. 6, 2020) [hereinafter *April 6 FAQs*],

https://www.sba.gov/sites/default/files/2023-03/Final%20PPP%20FAQs.pdf

[https://perma.cc/5434-87G8].

Relator criticizes Frost's proposed testimony on eligibility criteria as "clearly cross[ing]

into impermissible legal territory," arguing that her statements constitute statutory interpretation

and "directly weigh on *how* the jury should interpret the legal standards it will be tasked with

applying." (Frost Reply at 11, 13 (emphasis in original).) Defendant, in turn, claims that Frost's

testimony does not cross into prohibited territory, because she never applies her conclusions

about the PPP's eligibility requirements to Defendant — she "only opines on policies and practices, not on [Defendant's] actual conduct." (Frost Opp. at 23.) In the alternative, Defendant argues that the Fourth Circuit's opinion in *Offill* permits such expert testimony on legal issues, given the complexity of the underlying legal regime. (*Id.* at 18–19 (citing *Offill*, 666 F.3d at 175–76).) In any event, Defendant submits that these requirements constitute "key aspects of the program that the factfinder will need to understand in order to properly assess Relator's two main arguments." (*Id.* at 11.)

The Court disagrees with Relator's objections. Frost's proposed testimony tracks the plain language of the statutory text, which clearly delineates the two ways that Congress provided for applicants to establish their eligibility for PPP loans. Nothing about her testimony suggests an exercise in statutory interpretation or any other kind of legal "opinion" that would undermine the Court's role in explaining the law to the jury. Instead, Ms. Frost's proposed testimony more closely resembles the background information that she proffered about the PPP and the statutory framework, which the Court already deemed helpful to the jury, and whose admission the case law overwhelmingly supports. The Court therefore denies Relator's request for exclusion of this testimony.

Relator argues, somewhat improbably, that Ms. Frost's impermissible legal opinions render all of her background testimony inadmissible, as they "infect every opinion she intends to provide to the jury." (Frost Mem. at 12 (internal quotation omitted).) In her reply brief, Relator elaborates on this "infection" argument, claiming that "the whole of Ms. Frost's proposed testimony proceeds from her impermissible opinions concerning the intent and purpose of SBA regulations and the PPP," and that therefore, her entire testimony must be excluded. (Frost Reply at 12.) The Court rejects these claims, given the, at best, tenuous connection between Ms.

39

Frost's fact-based testimony on the history and actions of the SBA on one side, and her (admittedly impermissible) beliefs as to what Congress sought to achieve by creating the PPP on the other. The Court's decision to exclude the latter category of testimony sufficiently addresses Relator's concerns. Thus, the Court need not further consider Relator's "infection" argument at this time.

The Court finally turns to Ms. Frost's rebuttal opinions, which it excludes in full. Ms. Frost frames her supplemental report as responding, first and foremost, to Mr. Adams's opinions concerning Defendant's 2019 average headcount. She specifically seeks to counter what she characterizes as Adams's faulty assumptions concerning: (1) the applicability of 13 C.F.R. § 121.106(a) to the "PPP 500-employee headcount methodology" (Frost Supp. Report ¶ 6); (2) the SBA's expectation that prospective borrowers look to that regulation when self-assessing their employee numbers for purposes of a PPP application (*Id.* ¶ 14); and (3) the inapplicability of a "totality of the circumstances" analysis to the employee headcount calculation. (*Id.* ¶¶ 23–25.) However, the Court already found that Mr. Adams's opinions on the proper scope of Defendant's 2019 headcount for purposes of the PPP eligibility requirements constitute inadmissible legal opinions. *See supra* Section III.A.1. That finding necessarily encompasses the interpretive assumptions that led Adams to arrive at his conclusions, which will also be excluded at trial. As such, Ms. Frost's rebuttal opinions are rendered moot, since there will be no evidence for her to "contradict or rebut . . . on the same subject matter." Fed R. Civ. P. 26(a)(2)(D)(ii). Nor are they admissible in their own right, since they also constitute legal interpretations — albeit contrary to Mr. Adams's — of the PPP's regulatory framework. Such

interpretive work remains the province of the Court, not the experts.[16]  For all of these reasons, the Court excludes Ms. Frost's rebuttal opinions in full.

In sum, the Court will permit Ms. Frost to provide expert testimony about the SBA and the PPP, including background information about the SBA, the scope of its pre-COVID work, the traditional rulemaking processes that federal agencies typically follow, the CARES Act's passage, the subsequent creation of the PPP, the PPP's statutory and regulatory structure (including size eligibility requirements), permissible uses of PPP funds, and the guidance issued by the SBA on various PPP-related issues, including the PPP's "economic uncertainty" requirement and loan forgiveness.  The Court precludes her from testifying about Congress's intent or purpose relative to the PPP's creation and implementation, the experiences of small businesses during the early stages of the COVID-19 pandemic, and the SBA's motivations and decision-making processes during the PPP's implementation, including the effects of its decisions on small businesses during those early stages.  The Court also excludes her proposed testimony rebutting Mr. Adams's interpretation of PPP eligibility requirements related to headcount, which the Court has already excluded.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Adams Motion.  (ECF No. 73.)  Mr. Adams may testify at trial about Defendant's business and financial condition up to April 10, 2020, including its levels of working capital and cash reserves, its economic forecasts and its ability to maintain payroll without a PPP loan.  Mr.

---

[16]    While the Court deferred ruling on Mr. Adams's opinion that, when factoring in temporary employees, Defendant had an average 2019 headcount of 528 employees, Ms. Frost never rebuts the veracity of that opinion — only the legal framework underpinning its calculation.  Since Mr. Adams's opinions concerning that legal framework have been excluded, Ms. Frost's rebuttal opinions on the same will be excluded as well.

Adams may not testify about his interpretation of the PPP headcount requirement and whether temporary employees must be included in such calculations. Mr. Adams may also not testify about whether Defendant failed to satisfy any such eligibility requirements. In addition, subject to the exceptions set forth above, Mr. Adams may not testify to Defendant's financial condition or other related information after April 10, 2020. Nor may Mr. Adams opine on the goals of the PPP, the economic conditions faced by the construction industry during the COVID-19 pandemic or the FCA's statutory damages framework. The Court defers ruling on the admissibility of Mr. Adams's opinions concerning Defendant's 2019 average headcount, Defendant's co-owner taking an owner distribution in July 2020 and Defendant's contrary statements in its loan forgiveness application.

The Court also GRANTS IN PART and DENIES IN PART Relator's Frost Motion. (ECF No. 76.) Ms. Frost may provide general background testimony on the topics outlined by the Court, but she may not testify to Congressional intent or purpose, the experiences of small businesses during the early stages of the COVID-19 pandemic, and the SBA's motivations and decision-making processes during the PPP's implementation. She also may not provide her proffered rebuttal testimony to Mr. Adams's report.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

/s/

David J. Novak
United States District Judge

Richmond, Virginia
Dated: August 19, 2025

42